# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00682-CV

**Texas Mutual Insurance Company, Liberty Mutual Insurance Company, Zenith Insurance Company and Zurich American Insurance Company, Appellants**

**v.**

**Vista Community Medical Center, LLP, d/b/a Vista Medical Center Hospital; Christus Health Gulf Coast; and The Texas Department of Insurance, Division of Workers' Compensation, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-06-000213, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

This appeal concerns a challenge to the validity of a rule promulgated by the Texas Department of Insurance, Division of Workers' Compensation,[1] regarding hospital fee reimbursement for inpatient services to injured workers' compensation patients. *See* 22 Tex. Reg. 6264-308 (July 4, 1997) (originally codified at 28 Tex. Admin. Code § 134.401), *repealed*, 33 Tex. Reg. 5319 (July 4, 2008). Appellee Vista Community Medical Center, LLP, d/b/a Vista

---

[1] The rule at issue was originally promulgated by the Texas Workers' Compensation Commission in 1997, but the legislature abolished the TWCC in 2005 and transferred its duties and rules to the Division of Workers' Compensation within the Texas Department of Insurance. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 265, §§ 8.001(b), .004(a), 2005 Tex. Gen. Laws 468, 607-11. In light of this change, we refer to the agency throughout this opinion as either the "Commission" or the "Division."

Medical Center Hospital filed suit against the Division and appellant Texas Mutual Insurance Company in a medical fee reimbursement dispute seeking a declaratory judgment that the "Stop-Loss Exception" in Rule 134.401[2] was invalid. Another hospital, appellee Christus Health Gulf Coast, and several insurance carriers, including appellants Liberty Mutual Insurance Company, Zenith Insurance Company, and Zurich American Insurance Company, intervened and sought competing declarations regarding the validity of Rule 134.401. The trial court severed the parties' claims for declaratory relief and, after a bench trial, issued a final judgment granting declaratory relief in favor of the hospitals and rejecting the Division's interpretation of the Stop-Loss Exception. Because we conclude there was error in the trial court's judgment, we affirm the trial court's judgment in part, and reverse and render in part.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1989, the Texas Legislature enacted a new Workers' Compensation Act that restructured workers' compensation law in Texas. *See* Tex. Lab. Code Ann. §§ 401.001-506.002 (West 2006 & Supp. 2008).[3] The Act charged the Division with the difficult task of developing medical fee reimbursement guidelines that would ensure quality medical care for injured workers and achieve effective medical cost control. *Id.* § 413.011; *see also Patient Advocates v. Texas*

---

[2] Rule 134.401 was adopted in 1997, *see* 22 Tex. Reg. 6264 (July 4, 1997), and formerly codified at 28 Tex. Admin. Code § 134.401 (2007), but has since been repealed. *See* 33 Tex. Reg. 5319 (July 4, 2008) (repealing Rule 134.401). Because the 1997 rule remains in effect for admissions occurring prior to its repeal effective March 1, 2008, we refer to the rule as "Rule 134.401" or the "1997 guideline."

[3] The Workers' Compensation Act was initially located in articles 8303-1.01 through 8308-11.10 of the Texas Revised Civil Statutes, but was codified in the labor code in 1993. *See* Act of May 12, 1993, 73rd Leg., R.S., ch. 269, 2003 Tex. Gen. Laws 987.

2

*Workers' Comp. Comm'n*, 80 S.W.3d 66, 71 (Tex. App.—Austin 2002), *aff'd in part, rev'd in part*, 136 S.W.3d 643 (Tex. 2004). To satisfy its legislative mandate to balance these competing legislative policy goals, the Division adopted the 1992 hospital reimbursement guideline, which was invalidated by this Court in 1995 for lack of a reasoned justification. *See Texas Hosp. Ass'n v. Texas Workers' Comp. Comm'n*, 911 S.W.2d 884, 885-86, 888 (Tex. App.—Austin 1995, writ denied) (declaring "Rule 400" void because it failed to include reasoned justification as required by section 2001.033 of the APA). In the wake of this Court's decision, the Division adopted the 1997 guideline, including the Stop-Loss Exception, at issue in this appeal. *See* 22 Tex. Reg. 6264.

### *The 1997 Guideline*

With certain exceptions, the 1997 guideline provides that hospitals are to be reimbursed for inpatient admissions under a standard per diem methodology based on the category of admission. *See generally* Rule 134.401(c)(1)-(2). The 1997 guideline also specifies two exceptions to the standard per diem reimbursement methodology. *Id.* 134.401(c)(2)(C). These two exceptions apply on a case-by-case basis and include the "Trauma-Burn-HIV," or "TBHIV," exception, and the Stop-Loss Exception. *See id.* 134.401(c)(5) & (6). Only the Stop-Loss Exception is at issue in this appeal.

With regard to the Stop-Loss Exception, Rule 134.401(c)(6) provides:

> Stop-loss is an independent reimbursement methodology established to ensure fair and reasonable compensation to the hospital for unusually costly services rendered during treatment to an injured worker. This methodology shall be used in place of and not in addition to the per diem based reimbursement system. The diagnosis codes specified in paragraph (5) of this subsection are exempt from the stop-loss

3

methodology and the entire admission shall be reimbursed at a fair and reasonable rate.

(A)    Explanation

    (i)    To be eligible for stop-loss payment the total audited charges for a hospital admission must exceed $40,000, the minimum stop-loss threshold.

    (ii)    This stop-loss threshold is established to insure compensation for unusually extensive services required during an admission.

    (iii)    If audited charges exceed the stop-loss threshold, reimbursement for the entire admission shall be paid using a Stop-Loss Reimbursement Factor (SLRF) of 75%.

    (iv)    The Stop-Loss Reimbursement Factor is multiplied by the total audited charges to determine the Workers' Compensation Reimbursement Amount (WCRA) for the admission.

    (v)    Audited charges are those charges which remain after a bill review by the insurance carrier has been performed. Those charges which may be deducted are personal items (e.g., telephone, television). If an on-site audit is performed, charges for services which are not documented as rendered during the admission may be deducted. The formula to obtain audited charges is as follows: Total Charges - Deducted Charges = Audited Charges.

(B)    Formula. Audited Charges x SLRF = WCRA.

(C)    Example. Total Charges:  $108,000; Deducted Charges: $8,001; Audited Charges:  $99,999. $99,999 x 75% = $74,999.25 (WCRA).

Rule 134.401(c)(6). In addition, Rule 134.401 also defines the terms "Stop-Loss Payment," "Stop-Loss Reimbursement Factor," and "Stop-Loss Threshold." *Id.* § 134.401(b)(1)(F)-(H). Stop-Loss Payment is "[a]n independent method of payment for an unusually costly or lengthy stay." *Id.* § 134.401(b)(1)(F). Stop-Loss Reimbursement Factor is "[a] factor established by the Commission

4

to be used as a multiplier to establish a reimbursement amount when the total hospital charges have exceeded specific stop-loss thresholds." *Id.* § 134.401(b)(1)(G). Stop-Loss Threshold is "[the] Threshold of total charges established by the Commission, beyond which reimbursement is calculated by multiplying the applicable Stop-Loss Reimbursement Factor by the total charges identifying that particular threshold." *Id.* § 134.401(b)(1)(H).

Rule 134.401 also sets forth certain general information as follows: All hospitals must bill their "usual and customary charges." *Id.* § 134.401(b)(2)(A). Hospital reimbursement for acute care hospital inpatient services rendered shall be the lesser of pre-negotiated rates between the hospital and insurance carrier, the hospital's usual and customary charges, or reimbursement as set out in subsection (c) of Rule 134.401 for the particular admission. *Id.* § 134.401(b)(2)(A)(i)-(iii). Additional Reimbursements as outlined in subsection (c)(4) will be determined on a case-by-case basis within the guidelines established for the specific services rendered. *Id.* § 134.401(b)(2)(B). Finally, all hospital charges are subject to audit as described in the Commission's rules. *Id.* § 134.401(b)(2)(C).

### *Medical Fee Disputes*

In 2001, with health care costs rising, the Division began to see a corresponding rise in the number of medical fee disputes between hospitals and insurance carriers. Under the labor code, a health care provider dissatisfied with a carrier's payment can file an administrative dispute with the Division. *See* Tex. Lab. Code Ann. § 413.031(a) (West Supp. 2008). A Division employee known as a medical dispute resolution officer, or MDRO, reviews the complaint and documentation filed by the provider and the carrier and determines the appropriate reimbursement due the provider

under the labor code and the Division's rules. *See id.* § 413.031(c); 28 Tex. Admin. Code § 133.307

(2007). If either party is dissatisfied with the MDRO's decision, that party can request a hearing

before an Administrative Law Judge at the State Office of Administrative Hearings (SOAH). *See*

Tex. Lab. Code Ann. § 413.031(k).[4] Under the labor code, the ALJ issues the final administrative

order. *See id.* §§ 402.073(b) (West Supp. 2008), 413.031(k). But a party may seek judicial review

of the ALJ's order in a Travis County District Court under the substantial evidence rule. *See id.*

§ 413.031(k-1).

Many of these administrative fee disputes concerned the applicability of the Stop-Loss

Exception. The hospitals argued that the Stop-Loss Exception applied whenever the audited

charges for a particular admission exceeded $40,000. The hospitals thus urged that whenever

the audited charges for a particular admission exceeded $40,000, reimbursement should be paid at

75% of the total audited charges using the Stop-Loss Reimbursement Factor in Rule 134.401. *See*

Rule 134.401(c)(6)(A)(iii). The insurance carriers disagreed and argued that reimbursing a hospital

admission at 75% of the total audited charges anytime those charges exceeded $40,000 would

produce a windfall for the hospitals and defeat the statutory objective of achieving effective

medical cost control. Accordingly, the carriers urged that, in addition to total audited charges

---

[4] There was a window of time between 2005 and 2007 when a party was not entitled to request a hearing at SOAH. In 2005, the Legislature amended section 413.031(k) to eliminate the option of requesting a hearing at SOAH in a medical fee dispute. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 265, § 3.245, 2005 Tex. Gen. Laws 469, 554 (amending section 413.031(k) of the labor code). But, in 2007, the Legislature re-wrote section 413.031(k) again and restored the option of requesting a SOAH hearing before seeking judicial review in a medical fee dispute. *See* Act of May 23, 2007, 80th Leg., R.S., ch. 1007, § 1, 2007 Tex. Gen. Laws 3525, 3525 (codified at Tex. Lab. Code Ann. § 413.031(k) (West Supp. 2008)).

exceeding $40,000, a hospital must prove that an admission involved "unusually costly" and "unusually extensive" services, before the Stop-Loss Exception applied. Essentially, the carriers argued that the hospitals must satisfy a two-pronged test before reimbursement under the Stop-Loss Exception applied.

When resolving these initial administrative disputes, the Division's MDROs issued conflicting opinions regarding the applicability of the Stop-Loss Exception. Some MDROs applied the Stop-Loss Exception whenever total audited charges exceeded $40,000, and some MDROs applied the Stop-Loss Exception on a case-by-case basis only to those cases involving unusually costly and unusually extensive services where total audited charges exceeded $40,000. For those cases appealed to SOAH, the first SOAH decisions issued in 2001 applied the Stop-Loss Exception on a case-by-case basis only to those cases involving unusually costly and unusually extensive services in which total audited charges exceeded $40,000. Thereafter, SOAH ALJs issued conflicting decisions on when to apply the Stop-Loss Exception. Like the Division's MDROs, some ALJs applied the Stop-Loss Exception whenever total audited charges exceeded $40,000, and other ALJs applied the Stop-Loss Exception on a case-by-case basis only in those cases involving unusually costly or unusually extensive services where total audited charges exceeded $40,000.

**The 2005 Staff Report & Resulting Appeals**

When Allen McDonald became Director of the Medical Review Division in 2004, he identified an internal split among Division employees over the proper interpretation and application of the Stop-Loss Exception. In the fall of 2004, McDonald ordered a halt in the issuance of MDRO decisions in Stop-Loss Exception disputes until he could investigate further. At the

7

January 2005 public meeting, the Division's Chairman inquired about the inconsistent agency positions regarding the Stop-Loss Exception. McDonald promised to report back at the next meeting. At the February 2005 public meeting, McDonald presented the 2005 Staff Report, a one-page document in which McDonald explained the proper interpretation and application of the Stop-Loss Exception. The 2005 Staff Report explained that in order to qualify for Stop-Loss Payment, an admission must have audited charges exceeding $40,000 and the admission must involve unusually costly and unusually extensive services. The agency Commissioners acknowledged McDonald for his presentation but took no official action regarding the 2005 Staff Report.

Between February 2005 and June 2006, Division MDROs applied the two-part interpretation of the Stop-Loss Exception in the 2005 Staff Report in almost 1,500 disputes. Many of these disputes, including the dispute that led to this case, were appealed directly to the district court.[5]

*The 2007 En Banc Panel Decision*

After the Staff Report was issued in 2005, SOAH began consolidating the Stop-Loss Exception disputes into one docket for consideration of threshold legal issues. This docket was assigned to an en banc panel of nine SOAH ALJs in 2006. In January 2007, after briefing on a limited record, the en banc panel rejected the Division's interpretation and application of the Stop-Loss Exception as explained in the 2005 Staff Report and held, 7-2, that the Stop-Loss Exception

---

[5] These appeals were taken during the window of time when parties were not entitled to a hearing at SOAH. *See* note 4 *supra*. The parties have informed the Court that these appeals are inactive pending resolution of this appeal.

8

applied in any case in which total audited charges exceeded $40,000. The en banc panel held that this dollar amount threshold was the only prerequisite for payment under the stop-loss method. In addition, the en banc panel held that a hospital's implant charges, regardless of mark-up, must be used when deciding whether the $40,000 threshold has been met. The en banc panel rejected the carriers' arguments that implant charges should be reduced to cost plus 10% as required in Rule 134.401 when determining whether audited charges exceeded $40,000.

Since the issuance of the en banc panel decision, SOAH ALJ's have ordered numerous reimbursements at 75% of audited charges. Most carriers have paid under protest and perfected appeals to the district court in these cases.[6]

### *The Trial Court's Judgment*

The instant appeal originated in 2006 when Vista appealed one of the many decisions rendered by the Division's MDROs pursuant to the 2005 Staff Report. In addition to the suit for judicial review allowed under the labor code, Vista sought a declaration under section 2001.038 of the Administrative Procedure Act, *see* Tex. Gov't Code Ann. § 2001.038 (West 2000), regarding the proper interpretation of the Stop-Loss Exception, as well as a declaration that the 2005 Staff Report was an invalidly adopted rule.

As one of the defendants in Vista's lawsuit, Texas Mutual filed an answer and counterclaim against Vista, as well as a cross-claim against the Division challenging the validity of Rule 134.401 and the Stop-Loss Exception. Texas Mutual sought competing declarations that the

---

[6] The parties agree that these appeals are likewise inactive pending resolution of this appeal.

1997 guideline, properly interpreted: (1) required that charges for implants be audited to cost plus 10% before determining whether an admission met the $40,000 minimum stop-loss threshold; and (2) required a hospital to prove that the services provided in an admission were unusually costly and unusually extensive before that admission was entitled to Stop-Loss Payment under Rule 134.401. Alternatively, Texas Mutual sought a declaration that the Stop-Loss Exception was invalid because it violated statutory standards and was an unconstitutional delegation of the Division's legislative authority to private parties.

Several carriers and another hospital intervened and sought declaratory relief regarding the application and validity of the Stop-Loss Exception. The trial court severed the parties' claims for declaratory relief from Vista's administrative appeal. After a bench trial, the trial court entered final judgment with the following declarations:

1.  The Court declares that the stop-loss reimbursement methodology of the Acute Care Inpatient Hospital Fee Guideline found at 28 Texas Administrative Code § 134.401(c)(6) requires only that a provider prove that its total audited charges exceed $40,000 in order for the stop-loss reimbursement methodology to apply; there is no additional requirement that a provider prove that the admission was unusually costly, or unusually extensive[,] in order for the stop-loss reimbursement methodology to apply.

2.  The Court declares that the Staff Report that was admitted into evidence as Vista Exhibit 9 and Joint Exhibit 4 is an administrative rule as defined in Tex. Gov't Code § 2001.003(6) and is invalid and voidable because it was not adopted in substantial compliance with Tex. Gov't Code § 2001.0225 through Tex. Gov't Code § 2001.034.

3.  Instead of remanding the rule to the Division under Tex. Gov't Code § 2001.040 to allow a reasonable time for the Division to either revise or readopt the rule through established procedures, the Court finds good cause to immediately invalidate the Staff Report because the Court holds that absent the addition of objective criteria, the phrases "unusually costly" and

"unusually extensive" as used by the Division are so vague and uncertain that their use in determining whether the stop-loss reimbursement methodology applies would be arbitrary.

4. The Court declares that when determining whether payment is due under 28 Tex. Admin. Code 134.401(c)(6), a carrier is authorized to audit all hospital charges in accordance with applicable Division retrospective rules, and is not limited to auditing for the deductions as described in 28 Tex. Admin. Code § 134.401(c)(6)(A)(v).

5. The Court declares that under 28 Tex. Admin. Code § 134.401(c)(6), a carrier is not authorized to reduce the provider's usual and customary charges for implantables, orthotics and prosthetics to cost plus 10% in determining whether the stop-loss reimbursement methodology applies for reimbursement purposes.

The trial court's judgment denied all further relief not specifically granted and ordered that each party was to bear its own costs, attorney's fees, and other expenses. The trial court denied Texas Mutual's motion for new trial, and the insurance carriers, including Texas Mutual, Liberty Mutual, Zenith, and Zurich American, appealed to this Court. The Division did not appeal.

## DISCUSSION

This appeal involves the proper interpretation and application of Rule 134.401. The carriers urge reversal of the trial court's judgment arguing that the trial court's declarations erroneously interpret Rule 134.401. The hospitals counter that the trial court's judgment was proper and this Court should affirm. The Division does not appeal the trial court's judgment but urges this Court to reject the carriers' challenges to the validity of Rule 134.401. For the reasons discussed below, we determine the trial court erred in its interpretation of Rule 134.401.

11

***Standard of Review***

We review the trial court's declaratory judgment *de novo*. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25-26 (Tex. 2003).

This appeal concerns a challenge to the validity of an administrative rule under section 2001.038 of the government code. *See* Tex. Gov't Code Ann. § 2001.038. When considering a challenge to the validity of an administrative rule, we begin with the presumption that the rule is valid, and the party challenging the rule has the burden of demonstrating its invalidity. *See Office of Pub. Util. Counsel v. Public Util. Comm'n*, 104 S.W.3d 225, 232 (Tex. App.—Austin 2005, no pet.); *McCarty v. Texas Parks & Wildlife Dep't*, 919 S.W.2d 853, 854 (Tex. App.—Austin 1996, no writ) (citing cases). We construe administrative rules, which have the same force and effect as statutes, in the same manner as statutes. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999); *Lewis v. Jacksonville Bldg. & Loan Ass'n*, 540 S.W.2d 307, 310 (Tex. 1976). In construing a Division rule, our primary objective is to give effect to the Division's intent. *Rodriguez*, 997 S.W.2d at 254. We defer to the Division's interpretation of its own rules so long as that interpretation is reasonable and consistent with the plain language of the rule. *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *see also* Tex. Gov't Code Ann. § 311.023(6) (West 2005). Our review is limited to determining whether the administrative interpretation is plainly erroneous or inconsistent with the rule. *Gulf States Utils.*, 809 S.W.2d at 207 (citing *United States v. Larionoff*, 431 U.S. 864, 872 (1977)). However, if an agency fails to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious. *Id.* (citing *Sam Houston Elec. Coop., Inc. v. Public Util. Comm'n*, 733 S.W.2d 905, 913 (Tex. App.—Austin 1987, writ denied)).

*Carrier Claims*

On appeal, the insurance carriers raise several challenges to the trial court's judgment. In general, the carriers argue that the trial court erred in its construction of Rule 134.401 and in its declaration that Rule 134.401 was a valid rule.[7] The carriers argue that Rule 134.401 is valid if properly interpreted. The carriers assert that the proper interpretation of Rule 134.401 requires proof that audited charges exceed $40,000, as well as proof that an admission involved unusually costly and unusually extensive services, before an admission can be paid under the Stop-Loss Exception. The carriers also argue that the trial court erred in its declaration that the terms "unusually costly" and "unusually extensive" are so vague as to be arbitrary and that the trial court should not have found the 2005 Staff Report to be an invalid rule. Finally, the carriers argue that the trial court erred in its declaration that the charges for implantables, orthotics, and prosthetics could not be audited to cost plus 10% when determining whether audited charges exceed $40,000.

Alternatively, the carriers assert that Rule 134.401 as interpreted by the trial court is invalid because it fails to satisfy the statutory requirements of labor code section 413.011. In particular, the carriers argue that Rule 134.401 as interpreted by the trial court violates labor code section 413.011 because:

- it does not result in fair and reasonable reimbursement;

- it is not based on Medicare reimbursement policies and methodologies;

- it has not been reviewed and revised every two years;

---

[7] Certain carriers argue that Rule 134.401 has been invalid since its inception or that it has become invalid for the various reasons we discuss.

13

- it no longer achieves effective medical cost control;

- it constitutes an unconstitutional private delegation of agency authority;

- it allows for reimbursement for medical services in excess of those amounts charged for similar treatment to individuals with an equivalent standard of living; and

- it is inconsistent with the labor code definition of "medical benefit."

### 1. Interpretation of the Stop-Loss Exception

We begin our analysis of the carriers' claims with a review of the trial court's interpretation of Rule 134.401. The carriers challenge the trial court's interpretation of the Stop-Loss Exception, or section 134.401(c)(6) of the rule. The plain language of the rule provides that the stop-loss method is an independent reimbursement methodology established to ensure fair and reasonable compensation to the hospital for unusually costly services rendered during treatment to an injured worker. *See* Rule 134.401(c)(6). The rule also provides that the stop-loss threshold was established to ensure compensation for unusually extensive services during a hospital admission and that an admission is eligible for stop-loss payment if the total audited charges exceed $40,000. *Id.* § 134.401(c)(6)(i)-(ii).

We construe administrative rules, which have the same force as statutes, in the same manner as statutes. *Rodriguez*, 997 S.W.2d at 254. As when construing a statute, we must read the rule as a whole, giving meaning and purpose to every part. *See Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex. 1991); *Ex Parte Pruitt*, 551 S.W.2d 706, 709 (Tex. 1977). We should not construe a rule in a way that would lead to an absurd or unreasonable result if another more reasonable construction or interpretation exists. *See National Plan Adm'rs, Inc. v. National Health*

*Ins. Co.*, 235 S.W.3d 695, 701 (Tex. 2007); *C&H Nationwide v. Thompson*, 903 S.W.2d 315, 322 n.5 (Tex. 1994). We give effect to all words in the rule and, if possible, do not treat any words as mere surplusage. *See Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). Accordingly, we avoid construing rules in a way that would render portions of the rule inoperable or meaningless. *See id.*

The trial court's declaration that a hospital need only demonstrate that total audited charges exceed $40,000 to be entitled to payment under the Stop-Loss Exception is contrary to the plain language of the rule. The rule states that the Stop-Loss Exception was established to ensure compensation for unusually costly and unusually extensive services during a hospital admission. *See* Rule 134.401(c)(6). The rule also states that the stop-loss threshold was established to ensure compensation for unusually extensive services during a hospital admission. *Id.* § 134.401(c)(6)(A)(ii). The trial court's declaration eliminates the Division's ability under the rule to ensure that the Stop-Loss Exception provides compensation for unusually costly and unusually extensive services.

The trial court's declaration is inconsistent with other provisions in the rule. For example, the rule defines "Stop-Loss Payment" as an independent method of payment for an unusually costly or lengthy stay. *Id.* § 134.401(b)(1)(F). But the trial court's declaration precludes consideration of whether a hospital admission was unusually costly or lengthy. In addition, the rule states that $40,000 is the "*minimum* stop-loss threshold." *Id.* § 134.401(c)(6)(A)(i) (emphasis added). By its terms, this language suggests that there must be something more than a dollar amount to be considered when determining whether to apply the Stop-Loss Exception. The basic structure

of the rule is consistent with this concept: The rule provides that reimbursement will be made under the standard per diem method unless an exception applies. *Id.* § 134.401(c)(2). The rule further states that independent reimbursement under the Stop-Loss Exception will be "allowed on a case-by-case basis." *Id.* § 134.401(c)(2)(C). This language suggests that the Stop-Loss Exception was meant to apply on a case-by-case basis in relatively few cases. Without consideration of whether an admission involves unusually costly or unusually extensive services, there can be no determination on a case-by-case basis, and the Stop-Loss Exception would mechanically apply in all cases where total audited charges exceeded $40,000. Reading the language of the rule as a whole, this cannot be what the Division intended.

The trial court's declaration is also contrary to the legislative mandate in the labor code because it precludes the Division from achieving effective medical cost control. Under the trial court's interpretation, the Division cannot limit the application of the Stop-Loss Exception to those cases involving unusually costly and unusually extensive services in which total audited charges exceed $40,000. When the Division adopted the 1997 guideline, it provided for a standard per diem reimbursement methodology with two exceptions. With the rise in health care costs as demonstrated by the record evidence in this case, the trial court's interpretation leads to the absurd and unreasonable result that reimbursement under the Stop-Loss *Exception* has replaced the standard per diem method as the general method of hospital reimbursement. Stated differently, the exception has now become the rule. We do not believe that this is what the Division intended when it adopted the 1997 guideline.

16

For these reasons, we conclude that the trial court's interpretation is contrary to the plain language of the rule, renders portions of the rule meaningless, and leads to results inconsistent with the intent of the statutory structure. A more reasonable interpretation of the rule is that to be eligible for reimbursement under the Stop-Loss Exception, a hospital must demonstrate that total audited charges exceed $40,000 and that an admission involved unusually costly and unusually extensive services. This interpretation is consistent with the plain language of the rule, which states that the stop-loss method was established to ensure fair and reasonable compensation to the hospital for unusually costly and unusually extensive services. *Id.* § 134.401(c)(6), (c)(6)(A)(ii). It is likewise consistent with the interpretation urged by the Division in the 2005 Staff Report, which we address more fully below. And it is consistent with the basic structure of the rule, which calls for reimbursement under the standard per diem method except as allowed on a case-by-case basis under the Stop-Loss Exception. Accordingly, we sustain the carriers' challenge, reverse the trial court's declaration, and render judgment that the Stop-Loss Exception requires a hospital to demonstrate that total audited charges exceed $40,000 and that the admission involved unusually costly and unusually extensive services to receive reimbursement under the stop-loss method.

We emphasize that, in light of the legislative mandate in section 413.011 of the labor code requiring the Division to adopt fee guidelines designed to achieve both quality medical care and effective medical cost control, this is a more reasonable interpretation of the Stop-Loss Exception in Rule 134.401. Furthermore, because we adopt the construction of the rule urged by the carriers on appeal, we need not reach the carriers' alternative claims that the rule, as construed by the trial court, is an invalid delegation of the Division's legislative authority. Nor do we reach

17

the carriers' claims that the rule, as interpreted by the trial court, is invalid because it fails to provide fair and reasonable reimbursement, fails to achieve effective medical cost control, or allows for reimbursement for medical services in excess of those amounts charged for similar treatment to individuals with an equivalent standard of living as required in section 413.011 of the labor code, or that the trial court's interpretation is inconsistent with the definition of "medical benefit" in labor code section 401.011(31).

To the extent certain carriers maintain that Rule 134.401 was invalid at its inception, or became invalid at some later date, because the rule is not based on Medicare reimbursement policies and methodologies and has not been reviewed and revised every two years, we find those claims to be without merit. While we agree with the carriers that section 413.011 of the labor code currently requires the Division to adopt medical fee guidelines that follow Medicare reimbursement policies and methodologies, *see* Tex. Lab. Code Ann. § 413.011(a), this requirement was not part of the statute when the Division adopted Rule 134.401 in 1997 and was not added until 2001. *See* Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 6.02, 2001 Tex. Gen. Laws 5167, 5185 (amending section 413.011(a) to require the Division to "adopt the most current reimbursement methodologies . . . used by the federal Health Care Financing Administration").[8] Because this requirement was not part of the statute in 1997, the rule was not invalid at its inception for failing to meet this

---

[8] This language was changed in 2005 from "Health Care Financing Administration" to "Centers for Medicare and Medicaid Services." Act of May 29, 2005, 79th Leg., R.S., ch. 265, § 3.233, 2005 Tex. Gen. Laws 469, 548.

18

requirement. Nor do we believe that the rule became invalid at the moment this requirement was added to the statute in 2001.[9]

Similarly, we agree that section 413.012 states that the medical fee guidelines "shall be reviewed and revised" every two years to reflect fair and reasonable rates and to reflect reasonable and necessary ranges of medical treatment. *See* Tex. Lab. Code Ann. § 413.012 (West 2006). But it does not follow that the Division's failure to review and revise the 1997 guideline every two years since it was adopted invalidates the rule.

Although we generally construe the term "shall" as imposing a duty or obligation, *see* Tex. Gov't Code Ann. § 311.016 (West 2005), Texas courts have, in certain circumstances, construed "shall" to be directory. *See, e.g.*, *Albertson's Inc. v. Sinclair*, 984 S.W.2d 958, 961 (Tex. 1999). To determine whether the legislature intended a provision to be mandatory or directory, we consider the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction. *See Schepps v. Presbyterian Hosp. of Dallas*, 652 S.W.2d 934, 936 (Tex. 1983) (citing *Chisholm v. Bewley Mills*, 287 S.W.2d 943, 945 (Tex. 1956)). The supreme court has held that "provisions which are not of the essence of the thing to be done," but are directed instead towards the prompt and orderly conduct of business, are not generally considered mandatory. *Id.* When a statute is silent about consequences of noncompliance, we look to the statute's purpose in determining the proper consequence of noncompliance. *Id.* at 938. "If a provision requires that an act be performed within a certain time without any words

---

[9] "The measure of the validity of an agency rule is whether it is constitutional and whether it conforms to the procedural and substantive statutes applicable to its adoption." *Texas Dep't of Banking v. Restland Funeral Home, Inc.*, 847 S.W.2d 680, 683 (Tex. App.—Austin 1993, no writ).

19

restraining the act's performance after that time, the timing provision is usually directory." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 495 (Tex. 2001). Further, we liberally construe workers' compensation legislation to carry out its evident purpose of compensating injured workers and their dependents. *See Lujan v. Houston Gen. Ins. Co.*, 756 S.W.2d 295, 297 (Tex. 1988); *Ward v. Charter Oak Fire Ins. Co.*, 579 S.W.2d 909, 910 (Tex. 1979).

The legislature has provided no consequences for the Division's unfortunate noncompliance with the statutory directives in section 413.011 or 413.012 of the labor code. If the legislature had intended consequences for the failure to adopt Medicare reimbursement methodologies or the failure to review and revise the fee guidelines, it could have spelled out those consequences in the statute. With regard to the legislature's requirement that the Division adopt new *treatment* guidelines for injured workers, the legislature expressly provided that "[t]he treatment guidelines adopted under Chapter 413, in effect immediately before September 1, 2001, are abolished on January 1, 2002." *See* Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 6.09(b), 2001 Tex. Gen. Laws 5167, 5188. It speaks volumes that the legislature provided no consequences for the failure to adopt Medicare reimbursement methodologies or the failure to review and revise the fee guidelines every two years.

The carriers do not complain that the reimbursement rates under the 1997 guideline, as properly interpreted, are unreasonable. Nor have the carriers demonstrated harm from the application of the reimbursement rates in the 1997 guideline. Fee guidelines are just that—*guidelines*. They "merely assist carriers and, upon review, the [Division] in determining whether medical charges are 'fair and reasonable' or satisfy the applicable standard." *Methodist*

*Hosp. v. Texas Workers' Comp. Comm'n*, 874 S.W.2d 144, 149-50 (Tex. App.—Austin 1994, writ dism'd w.o.j.). This Court has previously held that there is no private right to a fee guideline established by rule. *See Texas Workers' Comp. Comm'n v. East Side Surgical Ctr.*, 142 S.W.3d 541, 549 (Tex. App.—Austin 2004, no pet.) ("East Side is only entitled to 'fair and reasonable' reimbursement—not to have the fee guidelines established by rule."). Accordingly, there can be no private right to an updated fee guideline or a guideline that uses a particular reimbursement methodology, so long as the reimbursement provided in the guideline is fair and reasonable. *See id.*

For these reasons, we conclude that the labor code's requirement to adopt fee guidelines that follow Medicare reimbursement methodologies and to review and revise these guidelines every two years are directory, not mandatory.[10] We further conclude that the Division's failure to comply with these statutory directives does not invalidate the 1997 guideline, or Rule 134.401.

### 2. "Unusually Costly" and "Unusually Extensive"

Within their challenge to the trial court's interpretation of Rule 134.401, the carriers argue that the trial court erred in its determination that the terms "unusually costly" and "unusually

---

[10] We reject the carriers' argument that this Court's opinion in *Texas Medical Association v. Texas Workers' Compensation Commission*, 137 S.W.3d 342 (Tex. App.—Austin 2004, no pet.), requires a different result. In *Texas Medical Association*, this Court stated that "the Commission has the ongoing statutory duty to review and revise the fee guidelines to ensure they are in compliance with the statutory factors," *see id.* at 350 (citing Tex. Lab. Code Ann. § 413.012 (West 2006)), but this Court did not consider whether that "ongoing duty" was mandatory or directory. *See id.* Nor did this Court consider the appropriate consequence for noncompliance with this "ongoing duty." Thus, our opinion in *Texas Medical Association* does not answer the question before us today—namely, whether this Court may invalidate an agency rule for noncompliance with a statutory directive when the legislature is silent.

extensive" are "so vague and uncertain that their use in determining whether the [Stop-Loss Exception] applies would be arbitrary." The carriers assert that such industry terms are knowable, calculable, and determinable and provide reasonably clear guidance to those parties affected by the rule.[11] We agree.

This Court has previously held that where an "idea embodied in a phrase is reasonably clear, a court should find it acceptable as a standard of measurement." *Texas Bldg. Owners & Managers Ass'n v. Public Util. Comm'n*, 110 S.W.3d 524, 535 (Tex. App.—Austin 2003, pet. denied). The supreme court has also recognized that a broad standard encompassing a multitude of factors will pass constitutional scrutiny if it is no more extensive than the public interest demands. *See Jordan v. State Bd. of Ins.*, 334 S.W.2d 278, 280 (Tex. 1960); *Housing Auth. v. Higginbotham*, 143 S.W.2d 79, 87 (Tex. 1940). Examples of standards upheld by Texas courts include "not worthy of public confidence," "unjust, fair, inequitable, misleading, deceptive," and "just and reasonable." *See Texas Bldg. Owners & Managers Ass'n*, 110 S.W.3d at 535 (citing cases).

We have held that Rule 134.401 requires a provider to demonstrate that the services it has provided are "unusually costly" and "unusually extensive" in order to be reimbursed under the stop-loss methodology. The phrases "unusually costly" and "unusually extensive" are no more vague or uncertain than other standards previously upheld by Texas courts. *See id.* (discussing standards and citing cases). They are no more vague or uncertain than other standards in the labor code requiring fee guidelines to be "fair and reasonable," "ensure quality medical care," and "achieve

---

[11] The record demonstrates that MDROs, carriers, and hospitals understand and are familiar with these terms because they have been previously utilized and applied in other cases since the 1997 guideline was promulgated.

effective medical cost control." *See* Tex. Lab. Code Ann. § 413.011(d). What is unusually costly and unusually extensive in any particular fee dispute remains a fact-intensive inquiry best left to the Division's determination on a case-by-case basis. *See Texas Bldg. Owners & Managers Ass'n*, 110 S.W.3d at 536 (holding that what is "reasonable" and "nondiscriminatory" is fact-intensive inquiry best left to discretion of Public Utility Commission).

No party disputes that the labor code delegates authority to the Division to establish medical fee guidelines, resolve medical fee disputes, and "adjudicate the payment given the relevant statutory provisions and commissioner rules." *Id.* §§ 413.011(d) (establish fee guidelines), .031(c) (adjudicate payment due). The scope of this authority includes the discretion to establish appropriate standards for reimbursement and to determine whether those standards have been met. *Id.* §§ 413.011(d), .031(c); *see also Texas Bldg. Owners & Managers Ass'n*, 110 S.W.3d at 535-36 (commission's authority to require payment of "reasonable" and "nondiscriminatory" compensation includes power to determine what is reasonable and nondiscriminatory when dispute arises). To the extent the parties are dissatisfied with the Division's determination, the labor code provides for review by SOAH and appeal to the courts. *See* Tex. Lab. Code Ann. § 413.031(k).[12]

There is no constitutional requirement that a statute or rule must define all of the terms used. *See Rooms with a View, Inc. v. Private Nat'l Mortgage Ass'n, Inc.*, 7 S.W.3d 840, 845 (Tex. App.—Austin 1999, pet. denied); *Garay v. State*, 940 S.W.2d 211, 219 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd). Recognizing the myriad of factual situations that may arise and allowing administrative agencies sufficient flexibility when drafting their rules, courts require no more than a

---

[12] *See also* note 4 *supra* (explaining that between 2005 and 2007 the legislature provided for direct appeal to the courts without allowing an administrative hearing at SOAH).

23

reasonable degree of certainty defining what is required or prohibited. *See Pennington v. Singleton*, 606 S.W.2d 682, 689 (Tex. 1980). Courts will invalidate an economic regulation "only if it commands compliance in terms so vague and indefinite as really to be no rule or standard at all . . . or if it is substantially incomprehensible." *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001) (internal quotation omitted); *see also Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) ("Economic regulation is subject to a less strict vagueness test."). Applying these principles to Rule 134.401, we conclude that the phrases "unusually costly" and "unusually extensive" are sufficiently definite to provide guidance to the MDROs and ALJs who review and determine medical fee disputes on a case-by-case basis. *See Hoffman Estates*, 455 U.S. at 498; *Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998). Therefore, we sustain the carriers' challenge and reverse the trial court's declaration to the contrary.

### 3.     2005 Staff Report

The carriers also challenge the trial court's determination that the 2005 Staff Report was an invalid and voidable rule. In its second declaration, the trial court held that the 2005 Staff Report was an administrative rule as defined in section 2001.003(6) of the government code, and that it was invalid and voidable because it was not adopted in compliance with government code sections 2001.0225 through 2001.034. *See* Tex. Gov't Code Ann. §§ 2001.003, .0225-.034 (West 2000) (defining "rule" and establishing rulemaking procedures). In its third declaration, the trial court invalidated the 2005 Staff Report because it found that the Division's use of the phrases "unusually costly" and "unusually extensive" in determining whether the Stop-Loss Exception applies would be arbitrary. The carriers urge this Court to reverse the trial court's declarations.

24

We agree with the carriers that the 2005 Staff Report is not an invalid and voidable rule. The APA defines a rule as "a state agency statement of general applicability that . . . implements, interprets, or prescribes law or policy; or . . . describes the procedure or practice requirements of a state agency." Tex. Gov't Code Ann. § 2001.003(6)(A). The APA definition of a rule includes "the amendment or repeal of a prior rule," but it does not include "a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *Id.* § 2001.003(6)(B)-(C).

As a preliminary matter, we conclude that the 2005 Staff Report was not a statement by a state agency. The 2005 Staff Report was a one-page document prepared by the director of the Medical Review Division within the Division that was intended to address an internal agency matter—namely, the inconsistent application of Rule 134.401. The 2005 Staff Report was presented to the Division at the January 2005 open meeting, but the Division simply thanked the director for the report and took no official action. The 2005 Staff Report recognized that the Division's MDROs had a history of inconsistently applying Rule 134.401, and proposed a correction to that internal inconsistency based on the language of Rule 134.401. For this reason, we conclude that the 2005 Staff Report was not a statement of the agency within the meaning of the APA.

Even if we recognized the 2005 Staff Report as an agency statement, it is well-established that not every administrative pronouncement is a rule within the meaning of the APA. *See Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994); *Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 769 (Tex. App.—Austin 1999, no pet.). "This observation refers to the fact that administrative agencies routinely issue letters, guidelines, and reports, and occasionally file

briefs in court proceedings, any of which might contain statements that intrinsically implement, interpret, or prescribe law, policy, or procedure or practice requirements." *Brinkley*, 986 S.W.2d at 769. If such statements were rules, an agency could not carry out its legislative functions: "How, under such a theory, could an agency practically express its views to an informal conference or advisory committee, or state its reasons for denying a petition to adopt a rule or file a brief in a court or agency proceeding?" *Id.*

The supreme court in *El Paso Hospital District v. Texas Health and Human Services Commission*, 247 S.W.3d 709 (Tex. 2008), analyzed whether an agency's interpretation of its own rule was also a rule.[13] In that case, the HHSC had interpreted its rule to impose a February 28th cutoff date when calculating Medicaid reimbursement rates. Under the rule's definition of "base year," the HHSC was required to use "'[a] 12-consecutive-month period of claims data,' to calculate the [h]ospitals' rates." *See id.* at 714 (quoting 1 Tex. Admin. Code § 355.8063(b)(5)). The supreme court concluded that the February 28th cutoff was contrary to the rule's definition of base year because it excluded several claims from the calculation of the hospitals' rates and thus amended the plain language of the rule. *Id.* Because the HHSC had not followed APA rulemaking procedures to promulgate the February 28th cutoff, the supreme court also held that it was invalid and enjoined the HHSC from using the February 28th cutoff to calculate the hospitals' reimbursement rates. *Id.* at 715 (citing Tex. Gov't Code Ann. § 2001.035 (West 2000)).

Unlike the HHSC's interpretation in *El Paso Hospital District*, the 2005 Staff Report does not contradict Rule 134.401. Moreover, assuming the 2005 Staff Report is an agency

---

[13] It is undisputed that the Division has authority to interpret its own rules.

26

statement, it is a statement regarding the agency's internal management that does not affect private rights. *See* Tex. Gov't Code Ann. § 2001.003(6)(C). The 2005 Staff Report is a statement regarding internal management because it is designed to correct MDROs' inconsistent application of the Stop-Loss Exception. It also allowed the agency to function effectively and produced clarity of direction in a highly technical area. The 2005 Staff Report did not affect private rights because it did not change or amend Rule 134.401; it simply mandated internal consistency when applying the rule.

We also reject the hospitals' argument that the 2005 Staff Report was a "new" interpretation of Rule 134.401. The record before us demonstrates that MDROs in the Division, as well as SOAH ALJs, had issued conflicting opinions interpreting and applying the Stop-Loss Exception in Rule 134.401 before the 2005 Staff Report was issued. Some MDROs and ALJs interpreted and applied the Stop-Loss Exception in the same manner as the 2005 Staff Report, and some did not. Because there were prior opinions and decisions interpreting and applying the Stop-Loss Exception in the same manner as the 2005 Staff Report, that report cannot, by definition, be a "new" interpretation of Rule 134.401.

For these reasons, we conclude that the 2005 Staff Report was not a rule within the meaning of the APA and, therefore, was not subject to APA rulemaking procedures. We sustain the carriers' challenge and reverse the trial court's declaration that the 2005 Staff Report was an invalidly adopted rule.

### 4. Reimbursement for Implantables, Orthotics, and Prosthetics

The carriers also challenge the trial court's declaration that Rule 134.401 does not allow a carrier to audit a provider's charges for implantables, orthotics, and prosthetics to cost plus

10% when determining whether the $40,000 stop-loss threshold has been met. For the following reasons we overrule the carriers' challenge and sustain the trial court's judgment.

Rule 134.401 specifically carves out reimbursement for implantables, orthotics, and prosthetics. *See* Rule 134.401(b)(2)(B) (general information regarding additional reimbursements), (c)(4) ("Additional Reimbursements"). When medically necessary, implantables, orthotics, and prosthetics are reimbursed as "Additional Reimbursements" under the rule.[14] *Id.* § 134.401(c)(4)(A). As provided in the rule, implantables, orthotics, and prosthetics shall be reimbursed at the cost to the hospital plus 10%. *Id.* Rule 134.401 also provides that "[a]ll charges are subject to audit as described in the Commission rules." *Id.* § 134.401(b)(2)(C). Rule 134.401 provides that when *audited* charges exceed the $40,000 stop-loss threshold, the entire admission shall be reimbursed using the 75% stop-loss reimbursement factor. *Id.* § 134.401(c)(6)(A)(iii).

Reading these provisions together, we conclude that the charges for implantables, orthotics, and prosthetics must be audited before those charges can be used to determine whether the $40,000 stop-loss threshold has been met. The question then becomes audited to what? The carriers argue that these costs should be reduced, or audited, to cost plus 10% as specified in section 134.401(c)(4)(A). We do not believe this is what the Commission intended. Consider the following example: if the cost for implantables in a given admission was $40,000, under the carriers' interpretation, this cost would be audited to cost plus 10%, or $44,000, for purposes of determining whether the Stop-Loss Exception applied. Assuming that the admission involved

---

[14] Also included in the category of "Additional Reimbursements" are magnetic resonance imaging (MRIs), computerized axial tomography (CAT scans), hyperbaric oxygen, blood, air ambulance, and pharmaceuticals. Rule 134.401(c)(4)(B)-(C).

unusually costly and unusually extensive services and because $44,000 is greater than $40,000, the Stop-Loss Exception would apply. Therefore, the entire admission would be reimbursed using the following formula:

Audited Charges x 75% SLRF[15] = WCRA[16]

*See* Rule 134.401(c)(6)(B). Applying this formula to the example, the hospital would be reimbursed only $33,000, or $7,000 less than its cost, for the implantables. Under this example, the hospital, or other provider, would incur a loss.

Because providers would incur losses under the carriers' proposed construction of the rule, that interpretation would be contrary to the statutory requirement that fee guidelines be "fair and reasonable." *See* Tex. Lab. Code Ann. § 413.011(d). We cannot construe the rule in a manner that is inconsistent with the statute. *See, e.g.*, *Centerpoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81, 85 (Tex. 2004) (observing that rule is invalid if it violates statutory provision); *Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 657-58 (Tex. 2004) (upholding rule as consistent with statute); *National Plan Adm'rs, Inc.*, 235 S.W.3d at 701 (courts should not construe statute in manner that leads to absurd results); *C&H Nationwide*, 903 S.W.2d at 322 n.5 (same).

For these reasons, we conclude there was no error in the trial court's declaration that the costs for implantables, orthotics, and prosthetics should not be reduced to cost plus 10%

---

[15] SLRF means "Stop-Loss Reimbursement Factor." *See* Rule 134.401(c)(6)(A).

[16] WCRA means "Workers' Compensation Reimbursement Amount." *See id.*

when determining whether the $40,000 stop-loss threshold has been met. This is consistent with the plain language of the rule and section 413.011 of the labor code. It is likewise consistent with the trial court's judgment that a carrier is authorized to audit all hospital charges in accordance with applicable Division retrospective review rules, which we affirm because no party has challenged that declaration on appeal.

## CONCLUSION

Having considered all of the parties' issues, we affirm the trial court's judgment that carriers may audit a provider's charges as permitted by the Division's rules and that a carrier may not reduce the charges for implantables, orthotics, and prosthetics to cost plus 10% when determining whether the Stop-Loss Exception applies. We reverse the trial court's judgment that the Stop-Loss Exception applies to any admission in which audited charges exceed $40,000, and we render judgment that, to establish eligibility for reimbursement under the Stop-Loss methodology, a provider must demonstrate that audited charges exceed $40,000 and that the services provided were unusually costly and unusually extensive so as to allow application of the exception. We also reverse the trial court's judgment that the 2005 Staff Report is an invalid rule and that the phrases "unusually costly" and "unusually extensive" are so vague and uncertain that their use by the Division in determining whether the Stop-Loss Exception applies would be arbitrary.

30

_____

Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed in part; Reversed and Rendered in part

Filed:   November 13, 2008