# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00098-CV

**Luminant Energy Company LLC, Appellant**

**v.**

**Public Utility Commission of Texas, Appellee**

## DIRECT APPEAL FROM THE PUBLIC UTILITY COMMISSION OF TEXAS
## PROJECT NO. 51617

## O P I N I O N

In this direct appeal, we consider a challenge to the validity of a pair of related Orders issued by the Public Utility Commission (PUC, Commission) on February 15 and 16 of 2021, respectively, governing scarcity pricing in the wholesale electricity market during Winter Storm Uri. *See* Order Directing ERCOT to Take Action and Granting Exception to Commission Rules, PUC Project No. 51617 (Feb. 15, 2021); Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules, PUC Project No. 51617 (Feb. 16, 2021). Appellant Luminant Energy Company LLC (Luminant) and aligned intervenors[1] (collectively, Appellants)

---

[1] Appellant-Intervenors are Constellation NewEnergy, Inc.; Exelon Generation Company, LLC; Logan's Gap Wind LLC; Pattern Energy Group LP; Pattern Gulf Wind, LLC; Pattern Panhandle Wind, LLC; Pattern Panhandle Wind 2 LLC; RWE Renewables Americas LLC; Texpo Power LP; and TX Hereford Wind, LLC. Appellee-Intervenors are Calpine Corporation; Talen Energy Corporation; and TexGen Power, LLC. Intervenor DGSP2 LLC aligns with different parties on different issues.

contend that the subject Orders (1) constitute de facto competition rules under Chapter 39 of the Texas Utilities Code, (2) were adopted in violation of the rulemaking provisions of the Administrative Procedure Act (APA), and (3) exceed the Commission's statutory authority. We agree with Appellants' first and third points and therefore do not reach the second. We reverse the Commission's Orders and remand for further proceedings consistent with our ruling.

## I.
## BACKGROUND

The generation and sale of electric power is subject to a number of unique physical and engineering constraints that make it unlike other goods and services. Although battery technology is constantly improving, electricity remains difficult to store at scale, meaning that most electricity generation must occur concurrently with consumption. *See, e.g.*, *TXU Generation Co., v. Public Util. Comm'n of Tex.*, 165 S.W.3d 821, 827 (Tex. App.—Austin 2005, pet. denied) (discussing background of electricity market in Texas). Moreover, for technical reasons, generation and consumption must at all times be maintained in near-perfect balance at an equilibrium point of 60 Hertz, or else a total grid collapse, together with serious damage to grid equipment, could result. *Id*. at 828. Moreover, constraints on transmission can result in grid congestion, and power generated in one geographic region may not be available to consumers in another. *Id*. at 827.

In part for the foregoing reasons, electric power in Texas as elsewhere was historically thought of as a "natural monopoly," with economies of scope and scale that rendered it relatively insusceptible to efficient delivery through market competition. *Id*. (citing *Reliant Energy, Inc. v. Public Util. Comm'n of Tex.*, 101 S.W.3d 129, 133 (Tex. App.—Austin 2003), *rev'd in part by CenterPoint Energy, Inc. v. Public Util. Comm'n of Tex.*, 143 S.W.3d 81

2

(Tex. 2004)).  Through much of the Twentieth Century, electric utilities were authorized by law to operate in tightly regulated, vertically integrated monopolies throughout the state.  Monopoly power meant that, in any given geographical area, only one electric utility was authorized to provide electricity to retail customers.  Vertical integration meant that, for any given customer, a single entity controlled all three of the principal components of electricity delivery:  "generation of power; transmission of that power on high-voltage lines over long distances; and distribution of power over shorter distances to the ultimate consumer."  *TXU Generation*, 165 S.W.3d at 827 (quoting *City Pub. Serv. Bd. of San Antonio v. Public Util. Comm'n of Tex.*, 9 S.W.3d 868, 870 (Tex. App.—Austin 2000), *aff'd*, 53 S.W.3d 310, 312 (Tex. 2001)).  Tight regulation meant that, for any utility, the rates it could charge for electricity were set by the Commission.

The regulated monopoly model provided reliable electric power at a price to the consumer that actually fell year over year until the 1970s.  Beginning in or around 1973, however, the OPEC oil embargo and the resultant energy crisis—which came at a time when a substantial portion of electricity generation in the U.S. was fueled by petroleum—produced dramatic price increases and gave rise to political pressure from consumers for some kind of reform in order to control costs.  *See* Seth Blumsack, *Measuring the Benefits and Costs of Regional Electric Grid Integration*, 28 Energy L. J. 147, 149 (2007).  In response, Congress and several states enacted measures to encourage competition in the electric power market through deregulation and restructuring.  *See, e.g.*, Public Utility Regulatory Policies Act of 1978, Pub. L. 95–617, 92 Stat. 3117 (allowing electricity production by independent producers in federally regulated markets).  That restructuring has taken a variety of forms in different regions, but essential components typically include (1) the vertical disintegration of electric utilities into separate generation, transmission, and distribution utility entities; (2) retail competition at the generation

3

level, with customers able to choose from among competing providers selling at rates based on market prices rather than regulated costs; (3) the use of spot markets for energy and, in some cases, ancillary services such as capacity and reserves; and (4) the management of the transmission and distribution grid on a regional scale by an independent entity rather than the transmission owners. Blumsack, *supra* at 152.

The latter feature was necessary to ensure that competing generators received nondiscriminatory access to transmission infrastructure in order to reach their customers. Put another way, for generation to be deregulated and open to competition, it was necessary for transmission to remain tightly regulated and transparent, lest transmission owners grant preferential access to favored generators. Toward that end, the Federal Energy Regulatory Commission (FERC) in 1996 issued Orders 888 and 889 to require transmission utilities to give generators nondiscriminatory access under an open-access tariff and to publish real-time available capacity. *See* Order No. 888, *Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 61 Fed. Reg. 705-02 (1996) (codified at 18 C.F.R. pt. 35); Order No. 889, *Open Access Same-Time Information System (formerly Real-Time Information Networks) and Standards of Conduct*, 61 Fed. Reg. 21,737-01 (1996) (codified at 18 C.F.R. pt. 37). These orders, together with Order 2000, introduced the closely related concepts of Independent System Operator (ISO) and Regional Transmission Organization (RTO). Order No. 2000, *Regional Transmission Organizations*, 65 Fed. Reg. 45,854-01 (2000) (codified at 18 C.F.R. pt. 35). Though distinct in terms of governance structure and congestion protocols, ISOs and RTOs are sufficiently similar in function that the terms are often used interchangeably. Blumsack, *supra* at 147 n. 1. Either designation, RTO or ISO, refers to the

4

independent, not-for-profit organization that manages the joint transmission assets of a number of regionally interconnected transmission utilities in a deregulated region. Such entities have no assets of their own and take no position in the wholesale market, but are responsible for managing bulk transmission, ensuring equal access to the grid by customers and suppliers, dispatching reserve generation as needed to balance supply and demand, and often making a market for wholesale electric generation and ancillary services. *Id*. at 147. Today, seven such regional entities are operating in the United States, covering approximately half of the states and two-thirds of total annual demand.

Texas's foray into deregulation began in 1999, when the Legislature enacted Senate Bill 7, amending the Public Utility Regulatory Act (PURA) to deregulate Texas' electricity market and require that wholesale and retail rates generally be set by competition rather than regulation. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543, 2543–2625 (codified at Tex. Util. Code §§ 39.001–.910.) Texas is distinct in that, by sheer size, its grid is one of the nation's three major regional interconnections, and yet, because it is entirely within the state, it is not subject to FERC regulation. Nevertheless, deregulation in Texas has largely conformed to the pattern seen elsewhere in the country. With SB 7, the Legislature required monopolies in Texas to unbundle their generation, transmission, and distribution units and form separate entities. *See* Tex. Util. Code § 39.051(b). The newly deregulated market was placed under the regulatory jurisdiction of the PUC which, in turn, certified the Electric Reliability Council of Texas (ERCOT) as the ISO for a sprawling, self-contained grid that covers approximately 70 percent of the state geographically and serves approximately 90 percent of the state's electricity customers. *Texas Com. Energy v. TXU Energy, Inc.*, No. CA No. C-03-249, 2004 WL 1777597, at *1–2 (S.D. Tex. June 24, 2004), *aff'd*, 413 F.3d 503 (5th Cir. 2005).

5

As the ISO, ERCOT is responsible for ensuring (inter alia) system reliability, nondiscriminatory access to transmission and distribution systems, and clearance of all market transactions in the region served by the grid. Importantly, ERCOT acts as the central counterparty for all transactions it settles and is deemed to be the sole buyer to each seller (typically a generator), and the sole seller to each buyer (typically a retailer) of all energy and related services. ERCOT Nodal Protocols § 1.2(4). From a central control room that has been likened to an air traffic control center, ERCOT monitors the flow of energy from more than 680 generation units to more than 26 million customers over more than 46,500 miles of transmission lines, all while balancing generation with load to maintain a system frequency of 60 Hertz. *Extreme weather condition preparedness/power outages*: Hearing Before the S. Comm. On Bus. & Com. (Senate B&C Hr'g), 87th Leg., R.S. (Tex. 2021) (testimony of Bill Magness, President and CEO, ERCOT); *see also* Bill Magness, *Review of February 2021 Extreme Cold Weather Event—ERCOT Presentation* at 4 (Feb. 24, 2021). In addition to PURA and the substantive regulations adopted by the PUC pursuant to its rulemaking authority, ERCOT's board is also authorized to adopt rules or so-called "protocols" that provide a framework for the administration of the electricity market, subject to Commission oversight and review. *BP Chemicals, Inc. v. AEP Tex. Cent. Co.,* 198 S.W.3d 449, 452 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.); Tex. Util. Code § 39.151(d), (g).

**Scarcity pricing**

By statute, the PUC is required to "adopt and enforce rules relating to the reliability of the regional electrical network" or "delegate to an independent organization responsibilities for adopting or enforcing such rules." Tex. Util. Code § 39.151(d). In 2006, pursuant to that statutory directive, the Commission by rule established the general outline of a scarcity pricing mechanism

(SPM) for use during periods of high demand. 16 Tex. Admin. Code § 25.505(g) (effective May 30, 2019, to July 13, 2021). The rule required that ERCOT "use a stakeholder process to develop and implement rules" to add detail and specificity to the general mechanism. *Id*. § 25.505(h) (effective May 30, 2019, to July 13, 2021). Pursuant to an earlier version of that mandate, ERCOT in 2014 revised its protocols to include a complex mathematical formula and to enumerate several variables to determine when and how scarcity pricing takes effect. *See* ERCOT Nodal Protocols § 6.5.7.3.1, *Determination of Real Time On-Line Reliability Deployment Price Adder*.

Scarcity pricing is limited by rule to a system-wide offer cap (frequently abbreviated "HCAP") of $9,000 per megawatt hour (MWh). 16 Tex. Admin. Code § 25.505(g)(6)(B) (effective May 30, 2019, to July 13, 2021). To put that figure in perspective, a typical market clearing price for electricity in Texas can be as little as $30/MWh. The reason for the orders-of-magnitude delta has to do with the way the state's wholesale market is structured.

Texas is what is known as an "energy-only" market, meaning that generators are compensated only for energy actually sold, as contrasted with a so-called "capacity" market, in which generators are compensated for making capacity available even if it is not ultimately used. A "base-load" generation utility (that is, one intended to operate continuously for long periods under normal market conditions) may incur significant initial costs investing in capacity, while expecting to recoup those costs through daily operations by offering at or below the market clearing price on most days. A so-called "peaker" generator, however, may invest a comparable amount of capital in generating capacity that it expects to use only during a few peak hours on summer afternoons. To defray the high costs of developing and maintaining such seldom-used capacity, it is necessary for such generators to receive a very high rate of return per megawatt hour

7

on the energy they do sell.  Accordingly, the scarcity pricing mechanism is intended to accomplish two goals.  First, by offering windfall prices to peak generators through a number of scarcity price "adders," it creates incentives for any idle generation capacity to come online when demand (or "load") threatens to exceed supply.  Second, by imposing sticker-shock costs on consumption, it encourages conservation by any institutional consumers that may have some elasticity of demand, thus hopefully easing system load.

### Winter Storm Uri

Texas typically experiences peak electricity demand during its long hot summers as consumers rely on electric power to run their air conditioners.  In 2021, however, the winter weather event that has come to be known colloquially as Winter Storm Uri subjected the state's electrical grid to historically unprecedented stress.

The "perfect storm" of factors that would ultimately coalesce to produce Uri first came to meteorologists' attention in late December and early January, with a rapid rise in temperatures by as much as 90 degrees in the Earth's stratosphere over the North Pole.  Senate B&C Hr'g, *supra* at 08:28–54:30 (testimony of Bob Rose, Meteorologist, Lower Colorado River Authority).  Known simply as a "sudden stratospheric warming event," the phenomenon is not terribly unusual, occurring on average approximately once in four years, but, when combined with other factors, it can produce disruptions in the so-called "polar vortex," allowing super-chilled arctic air to flow south and at ground-level altitudes.  *Id*.  By late January, a pair of high-pressure ridges had begun to form near Greenland and the Gulf of Alaska, creating conditions favorable to a pronounced disruption of the jet stream that would allow bitterly cold Siberian air to spill over the pole and down across North America as far south as Texas.  *Id*.

8

The looming emergency did not go unnoticed by ERCOT. As early as November of 2020, the entity's meteorologist issued a winter outlook for market participants warning of "very good" chances for an extreme cold weather event during the 2020-21 winter season. Magness, *supra* at 9. On February 3, 2021, ERCOT warned market participants and the public of the coldest weather of the year, with additional advisories, operating condition notices, and press releases issued on February 10, 11, 13, and 14. *Id*. In anticipation of possible weather-related outages, pre-event precautions included canceling planned maintenance outages for more than 1,600 transmission devices, waiving COVID restrictions, activating additional on-site and remote engineering and support staff, and requesting emissions waivers from federal and state regulators. *Id*. at 8.

The Arctic air first began to arrive in Texas on Friday, February 12, 2021, with up to half-inch accumulations of ice observed on some surfaces. Senate B&C Hr'g at 9:20 (Rose testimony). Temperatures remained low into the weekend, hovering in the 20s and 30s, but dipped significantly on Sunday, February 14, as Siberian air flooded into Texas and plunged temperatures into the teens. *Id*. On Monday, February 15, the statewide average temperature in Texas was 11 degrees Fahrenheit. *Id*. Several cities posted record or near-record lows, with the Dallas–Fort Worth area logging its third lowest temperature ever observed at 2 degrees below zero, Austin logging its fifth lowest at 7 degrees, and Corpus Christi logging its all-time lowest observed temperature at 17 degrees. *Id*. Moreover, the duration of the freeze shattered records, with cities across north Texas experiencing more than 200 consecutive hours of temperatures below freezing, and parts of central Texas seeing more than 160 hours. *Id*. Temperatures in Austin remained below freezing for 144 consecutive hours, the longest period on record. *Id*. Unlike comparable cold-weather events in 1989 and 2011, the extreme cold combined with heavy precipitation to

9

produce record or near-record snowfall in parts of the state, with Dallas receiving 4–5 inches of accumulation over the weekend, Midland 5–6 inches, Austin between 6 and 8 inches (its fourth largest two-day total on record), and Del Rio nearly a foot of snow, an all-time record. *Id*. For temperatures alone, Uri entered the history books among the four or five coldest weather events since reliable recordkeeping began in 1895. *Id*. When duration and precipitation are taken into account, Uri may have been the most severe winter weather event in the recorded history of Texas.

At 8:30 a.m. on the morning of Sunday, February 14, 2021, ERCOT issued a conservation alert and media appeal. Magness, *supra* at 11. By mid-morning, it was already becoming clear to ERCOT's leadership that offers for so-called "ancillary services," *i.e.*, additional generation necessary to make up a shortfall in scheduled base generation relative to demand, would fall short of the anticipated load, and a watch to this effect was issued at 10:54 a.m. that morning. *Id*. Based on projected demand, it was anticipated that ERCOT would probably need to order transmission entities to "shed load" in order to maintain the 60-Hertz balance with generation, but it was expected that these measures would take the form of brief rotating outages that would not leave any customer without power for longer than a few hours. Senate B&C Hr'g 1:06:27 (Magness testimony). Despite the fact that demand was projected to break an all-time record, exceeding even the highest summer demand on record, it appeared to ERCOT personnel as though the system had enough generation online to get through the ensuing days with minimal disruption to service. *Id*. As night fell, however, all of that began to change.

At 9:58 p.m., ERCOT issued a reserve capacity watch. Magness, *supra* at 11. At 11:17 p.m., ERCOT deployed responsive reserve. *Id*. By 11:32 p.m., ERCOT issued another advisory, announcing a physical response reserve of less than 3,000 megawatts remaining. *Id*. By 12:15 a.m. on the morning of the 15th, reserves had fallen below 2,300 megawatts, sending

10

ERCOT into Energy Emergency Alert (EEA) Level 1. *Id.* By 1:07 a.m., reserves had fallen below 1,750, triggering EEA2 and prompting deployment of load resources. *Id.* At 1:20 a.m., ERCOT entered EEA3—its highest alert level—and began ordering that load be shed. *Id.*

As the storm continued to move southward through Texas in the early morning hours of the 15th, it froze poorly winterized natural gas wellheads and gathering lines, nearly halving the supply of the state's predominant fuel for electric generation at a time when the gas was already in high demand for direct-burn home heating in many areas. As more and more generation units went offline for want of fuel, the plummeting electricity supply rapidly overwhelmed ERCOT's ability to manage scarcity and began to threaten the stability of the grid itself. As of 1:23 a.m., a combined capacity of 35,343 megawatts of generation was reported offline due to weather-related causes, and the system frequency fell to 59.9 Hertz, prompting ERCOT to order 1,000 megawatts of load shed to stabilize it. *Id.* at 12. Just a few minutes later, however, at 1:26 a.m., three additional outages of 1,481 megawatts, 248 megawatts, and 329 megawatts occurred in rapid succession, causing the system frequency to fall to under 59.8 Hertz by 1:43 a.m. *Id.* This prompted another 1,000 megawatts of load shed, but the grid continued hemorrhaging generation, with outages of 606 megawatts, 688 megawatts, and 511 megawatts, respectively, between 1:48 a.m. and 1:53 a.m. *Id.*

These additional failures drove the grid past a critical threshold, as the system frequency dipped below 59.4 Hertz. *Id.*; *see also* Senate B&C Hr'g at 1:16:30 (Magness testimony). At that level there existed an imminent risk of oscillations that could damage grid components, perhaps permanently. As a rule, the system could remain below 59.4 for no more than nine minutes. The grid frequency that night was below 59.4 for a total of four minutes and three seconds, during which time two more rounds of load shed were ordered, of 3,000 megawatts

11

and 3,500 megawatts, respectively. Magness, *supra* at 12. The frequency bottomed out at 59.302 Hertz before beginning to recover. *Id*. By 2:03 a.m. it reached 60 Hertz again, but not before additional generation outages of 843 megawatts and 841 megawatts forced another 2,000 megawatts of load shed, bringing the total load shed that night to a staggering 10,500 megawatts.

The storm, at its worst, had taken out 48.6 percent of the generation available to ERCOT to manage the system. *Id*. at 13; *see also* Senate B&C Hr'g at 1:01:103 (Magness testimony). Some 4.5 million households and businesses lost power and, because of the volume of load shed, these outages could not easily be rotated without threatening critical infrastructure (*e.g.*, hospitals). For that reason, many of the homes affected were left without power for days at a time during some of the coldest days ever recorded in the state's history. Bad as this outcome was, ERCOT's then-CEO later testified that it could have been much worse. The system had come perilously near collapse and, had it been allowed to fail, the result would have been a weeks-long, statewide blackout. The worst potential outcome had been averted.

Also closely monitoring the situation that weekend were the then-current members of the Commission, all of whom have since resigned. During the course of the foregoing events, the previously established SPM (scarcity pricing mechanism) remained in effect but resulted in market clearing prices of just over $1,200/MWh. *Hearing to examine billing errors resulting from Winter Storm Uri and explore the means available for correcting those errors*: Hearing Before the S. Comm. on Juris., 87th Leg., R.S. (Tex. 2021) at 43:42—52 (Mar. 11, 2021) (testimony of Independent Market Monitor (IMM) director Carrie Bivens). In consultation with ERCOT personnel, then-PUC Chair DeAnn Walker concluded that the SPM had malfunctioned. Senate B&C Hr'g at 6:13:29 (testimony of DeAnn Walker, Chair, PUC). Chair Walker reasoned that the SPM was intended to move prices in an inverse correlation with reserve capacity and that, at load

12

shed, maximum demand had by definition been reached, such that the maximum offer price should be in effect as well. *Id*. Moreover, after speaking with ERCOT's leadership, she had a working hypothesis to explain exactly why the SPM had failed. Specifically, her understanding was that, as the grid shed load pursuant to ERCOT's emergency orders, the SMP algorithm erroneously disregarded the lost load altogether for purposes of computing price.

The significance of this inference should not be understated. Clearing prices act as price signals, letting market participants know when additional generation is needed. According to Chair Walker's interpretation, ERCOT's computer system was, in effect, sending the market a false signal—signaling that additional generation was not needed, or at least not needed as urgently as was actually the case—and thereby failing to adjust incentives to answer the exigency presented by the storm.

On the afternoon of February 15, 2021, the Commission held a brief open meeting in which the commissioners discussed the SPM and issued the first of the two Orders that are the subject of this litigation. Finding that the electricity market was clearing as low as $1,200 and that this outcome was "inconsistent with the fundamental design of ERCOT," the Commission directed ERCOT "to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." Order Directing ERCOT to Take Action and Granting Exception to Commission Rules, PUC Project No. 51617 at 1-2 (Feb. 15, 2021) (First Order). The First Order stated, "If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest." *Id.* at 1. By its terms, the First Order applied only to the then-in-effect EEA event.

Later that same day, ERCOT issued a market notice reflecting its understanding that the PUC's "directive [was] based on the [PUC's] observation in the order that energy prices

13

of less than $9,000/MWh during load shed conditions are 'inconsistent with the fundamental design of the ERCOT market.'" ERCOT, M-C021521-01 Emergency Order of the Public Utility Commission Affecting ERCOT Market Prices (Feb. 15, 2021). ERCOT then adjusted its price algorithm to cause the market to clear at the $9,000/MWh cap.

On the afternoon of the 16th, the Commission held a second meeting to revisit the First Order, ultimately issuing a second order that was substantially identical to the first, except that it rescinded language in the First Order that would have required retroactive repricing. Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules, PUC Project No. 51617 (Feb. 16, 2021) (Second Order). The Second Order again directed ERCOT that, if there was load shed, the market price for the energy needed to serve that load should also be "at its highest." *Id.* at 1. ERCOT has since issued settlement statements to market participants reflecting the $9,000/MWh clearing price.

## II.
## PROCEDURAL HISTORY

Appellant Luminant, a market participant subject to ERCOT protocols, filed its notice of direct appeal in this Court on March 2, 2021, challenging the first and second Orders as competition rules under Section 39.001(e) of the Utilities Code. Several parties intervened on either side. Generally, Appellants proceed on the theory that the subject Orders were procedurally invalid, beyond the PUC's statutory authority to adopt, or both. Luminant has also filed administrative challenges to settlement invoices issued by ERCOT for transactions during the storm, asserting that, because the subject Orders are invalid, the price of electricity in the settlement invoices is also incorrect. *See Luminant v. Public Util. Comm'n*, No. 03-21-00126-CV (Tex. App.—Austin).

14

In their responses, the Commission and its aligned intervenors argue that (1) the subject Orders are not rules; (2) if they are rules, they were adopted in substantial compliance with emergency rulemaking provisions of the APA; (3) the PUC was expressly authorized by statute to correct the allegedly erroneous pricing by the SPM; and (4) for a variety of reasons, this Court lacks subject-matter jurisdiction. As jurisdiction is a threshold issue, we address it first, before turning to the merits.

## III.
## DISCUSSION

**Subject-Matter Jurisdiction.**

The PUC challenges this Court's subject-matter jurisdiction in five separate but sometimes overlapping arguments. Each is addressed in turn.

### *Appellants' Claims are Not Moot.*

The Commission argues first that, because the Orders by their own terms applied only during the then-in-effect EEA3 event and consequent load shed, the Orders have now expired, and any controversy between the parties is now moot. We disagree.

Mootness doctrine generally requires that a case or controversy exist at all stages of a proceeding and that, if events resolve the dispute, the case should be dismissed as moot. *See, e.g., Matthews v. Kountze Indep. Sch. Dist.*, 484 S.W.3d 416, 418 (Tex. 2016). Events that may render a case moot include the death of a party, the settlement of the claim, the repeal of a challenged statute—essentially any change in the facts that ends the controversy. *See Electric Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634–35 (Tex. 2021). The doctrine has a constitutional dimension, in that it

15

prevents courts from rendering advisory opinions. *Wilson v. Community Health Choice Tex., Inc.*, 607 S.W.3d 843, 849 (Tex. App.—Austin 2020, pet. denied) (citing *Matthews*, 484 S.W.3d at 418).

Here, the controverted issue is the lawfulness of the Orders that purported to price electricity at its statutory cap of $9,000/MWh. If the Orders are held to have been lawful, so too (barring other grounds for challenge) will the invoices or settlement statements issued during the period in which the Orders were putatively in effect. If the Orders are held unlawful, Appellants (barring other factors not considered here) may succeed in their administrative challenges and secure adjustments to the invoiced amounts. The live controversy, then, is whether Appellants are presently entitled to the difference between the invoiced prices and the much lower clearing prices that they argue would have been charged in the absence of the allegedly invalid Orders. To grant or deny such material relief would not be to issue an advisory opinion.

The Commission cites a number of cases for the proposition that, generally, "where an order expires by its own terms … all issues relating to the validity of the order become moot." *Rodriquez v. Texas Dep't of Pub. Safety*, 533 S.W.2d 849, 851 (Tex. App.—Tyler 1976, no writ). Upon review, however, we find the cited authorities consistent with our understanding. In *Rodriquez*, for example, the plaintiff appealed from a trial-court judgment affirming a 12-month administrative suspension of his certificate of appointment as a motor vehicle inspector and of his garage's license as an official inspection station. *Id*. at 850. By the time the case reached the Tyler court, however, the suspension had expired. *Id*. On those facts, the court held the case to be moot. *Id.* at 850–51. In so holding, the court noted that "courts have sometimes entertained attacks on orders that have expired by their own terms because the person against whom such order was made might suffer some subsequent detriment if the legality of the order were not determined." *Id*. at 851. Rodriquez, however, sought "no relief other than reversal of the order of suspension"—he

16

did not, for example, claim to be entitled to monetary damages resulting from the suspension. *Id*. at 851. As such, an order of reversal could have had no prospective effect on any party's rights or duties. Here, in contrast, Appellants are separately disputing the settlement statements through ERCOT's administrative ADR process, alleging unlawful overpricing of thousands of dollars per megawatt hour; our decision in this appeal may have very real material consequences for all involved. The "subsequent detriment" Appellants will experience if the Orders are allowed to stand will be the obligation to honor the allegedly unlawful price.

In *Texas Department of Agriculture v. Wild Boar Meats, LLC*, the Department of Agriculture adopted an emergency rule to allow the temporary registration of a certain chemical pesticide for use in feral-hog abatement. No. 03-17-00514-CV, 2018 WL 3748677, at *1 (Tex. App.—Austin Aug. 8, 2018, pet. denied) (mem. op.). Wild Boar Meats, a company that purchased feral hogs and hog carcasses from local hunters for use in food products, believed the pesticide presented safety risks to humans and sued the Department challenging the validity of the rule. *Id*. While the case was pending, the sole manufacturer to have requested registration under the rule asked the Department to cancel its request citing negative publicity, and the Department notified the Secretary of State that it was withdrawing the rule. *Id*. at *2. In reversing the trial court's denial of the Department's motion to dismiss on mootness grounds, this Court noted that the rule was withdrawn several months before the hearing on the motion to dismiss and that nothing in the record suggested any pesticide had ever been used under the rule, concluding that "any declaration regarding its validity would have no legal effect" and that the claim was therefore moot. *Id*. at *3. The present case is distinguishable. Whereas the declaration sought in *Wild Boar* would not have halted any actual or threatened use of the pesticide under the former rule, Appellants in this case seek to avoid the financial burden they will experience if required to honor the allegedly inflated

17

electricity pricing in their pending administrative challenges to the allegedly invalid rule at issue here.

In *Railroad Commission of Texas v. Oil Production Maintenance, Inc.*, the owners and operators of a gas well sued the Railroad Commission to set aside and enjoin enforcement of an order placing the well under a six-month restriction limiting the daily volume of gas that could be produced from it. 319 S.W.2d 822, 823 (Tex. App.—Austin 1958 writ ref'd n.r.e.). The trial court held in favor of the plaintiffs and granted the injunction but, by the time the case came before this Court on appeal, the six-month interval had run, and the order had expired of its own terms. *Id*. Accordingly, we set aside the judgment below and dismissed the case as moot. *Id*. at 824. As in the other cases cited by the Commission—and unlike the present case—the plaintiff sought no greater relief than what had already been brought about by the expiration of the challenged rule.

The same distinction applies to the cases Calpine cites in its brief. In *State v. City of Austin*, the State sought to enjoin local orders intended to limit the spread of COVID-19 by suspending restaurants' dine-in food and beverage service each night from 10:30 p.m. to 6:30 a.m. over the holiday weekend beginning December 31, 2020, and ending January 3, 2021. No. 03-20-00619-CV, 2021 WL 1313349, at *1 (Tex. App.—Austin Apr. 8, 2021, no pet.) (mem. op.). The orders were in force for a total of 7.5 hours before being temporarily enjoined and then expiring by their own terms. *Id*. at *4. Despite the expiration, the State nonetheless proceeded with its suit. In dismissing, this Court noted that "nothing in the parties' briefing or the record indicates that the local officials actually enforced the local orders during the single 7.5-hour period that they were in effect." *Id*. at *5. We held that "*[a]bsent any enforcement efforts*," the State's

requested relief would have had no legal effect. *Id.* at \*5 (emphasis added).[2] Impliedly, the outcome may have been different had the plaintiff been a business owner who sought relief from a fine issued under the complained-of order. *Cf. Lowenberg, v. City of Dallas*, 261 S.W.3d 54, 59 (Tex. 2008) (suit for refund of allegedly unlawful municipal fire registration on ground that it was improper occupation tax not mooted by voluntary payment or subsequent repeal of ordinance).

Perhaps the most factually similar case the Commission cites is the second of two cases styled *El Paso County Hospital District v. Texas Health & Human Services Commission*, cited for the proposition that, "[e]ven if ERCOT undertook to reconstruct alternative pricing, those calculations would not make previously issued statements for EEA3-operating days any less valid." *See* 400 S.W.3d 72, 82 (Tex. 2013) (*El Paso II*). In *El Paso II*, a number of hospitals alleged that the Texas Health and Human Services Commission (HHSC) had used an invalid rule to calculate reimbursement rates for Medicaid services, resulting in alleged underpayments to the hospitals dating back years. Moreover, the hospitals in that case sought not only the prospective invalidation of the rule but the retroactive recalculation and recovery of past payments. The Commission's reliance on *El Paso II* is problematic, however, because, in that case, the Texas Supreme Court did not reach the retroactivity issue for which the Commission now cites it. *Id.* at 83 (referring to *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709 (Tex. 2008) (*El Paso I*) and explaining that "[w]e did not decide [in *El Paso I*] whether the

---

[2] *See also Methodist Hosps. of Dallas v. Texas Workers' Compensation Comm'n*, 874 S.W.2d 144, 147 (Tex. App.—Austin 1994, no writ) (dismissing as moot challenge to expired rule when no other relief sought and no suggestion that ruling could result in the recovery of previously incurred costs or relief from previously assessed but unlawful fees or expenses); *Young Trucking, Inc. v. Railroad Commission of Texas* 781 S.W.2d 719, 720 (Tex. App.—Austin 1989, no writ) (dismissing as moot challenge to lapsed one-year administrative suspension of the plaintiff's specialized motor carrier certificate when no prospective relief sought).

19

hospitals could reopen past agency proceedings or obtain relief for past years"). Moreover, much of the discussion of the availability of retroactive relief in that case concerned a close reading of administrative rules specifically applicable to HHSC and not relevant here. Finally, the relief sought here is not impermissibly retroactive because Appellants' administrative challenges remain pending. Thus, nothing in *El Paso II* requires us to deem the previously issued Orders for EEA3 a *fait accompli*, immune from review or revision.

Here, Appellants do not merely seek a sterile declaration of the invalidity of a now-defunct rule. Rather, they dispute the enforceability in still-pending administrative challenges of settlement statements issued pursuant to, and after the expiration of the allegedly invalid rule.

### *The Commission's "Voidability" Argument Does not Defeat Jurisdiction.*

The Commission also contends that, even if we find the Orders not to have been adopted in substantial compliance with the Act, we cannot grant the relief Appellants seek because a rule is valid until adjudicated void. Section 2001.035 of the Texas Government Code provides that "[a] rule is *voidable* unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034." Tex. Gov't Code § 2001.035 (emphasis added). The Commission cites a number of cases for the proposition that a voidable rule—as opposed to a rule that is void ab initio—is valid until adjudicated void. *See Meeker v. Tarrant Cnty. Coll. Dist.*, 317 S.W.3d 754, 761 (Tex. App.—Fort Worth 2010, pet. denied). Thus, the Commission reasons, "the validity of any actions ERCOT took in response to the … Orders in the interim (prior to a judgment in this case) is not contingent on previously-unadjudicated questions about APA compliance." *See Brazzel v. Murray*, 481 S.W.2d 801, 803 (Tex. 1972). "At best," the Commission concludes,

20

"Appellants' APA challenge can invalidate only *future* efforts to include firm-load shed in calculating scarcity pricing signals." We disagree.

The Commission makes much of the distinction between an act that is void ab initio, which is a legal nullity, and an act that is merely voidable, and which therefore remains in effect until adjudicated void. The Commission would have us conclude that, upon holding a voidable rule to be void, a court is powerless to grant an aggrieved party any relief that would disturb the outcomes of actions previously undertaken pursuant to the then-voidable, now-void rule. We find that proposition poorly supported by the cases the Commission cites.

Two such cases arose under the Texas Open Meetings Act, which provides that "[a]n action taken by a governmental body in violation of this chapter is voidable." Tex. Gov't Code § 551.141. In the first of these, Meeker challenged the validity of successive employment contracts between the Tarrant County College District and its chancellor, Dr. de la Garza, arguing that deliberations on the contracts violated the Open Meetings Act because the agenda notices for three meetings were improper, making two resultant contracts void. *Meeker*, 317 S.W.3d at 758. Meeker sought to enjoin the college from paying de la Garza's salary or otherwise recognizing him as chancellor. *Id*. Finally, Meeker sought attorney's fees. *Id*. at 760. The college prevailed on cross-motions for summary judgment, and Meeker appealed. *Id*. at 758. While the appeal was pending, the college entered into an amended contract with de la Garza under which he would step down as chancellor and receive severance consideration for release of claims. *Id*. The college then moved to dismiss the pending appeal as moot. *Id*. In dismissing the case, the Fort Worth court held that, because all of Meeker's requests for injunctive relief related to de la Garza's service as chancellor, the cause was moot because de la Garza was no longer the chancellor. *Id*. at 760 (citing *Day v. First City Nat'l Bank of Hous.*, 654 S.W.2d 794, 795 (Tex. App.—Houston [14th

Dist.] 1983, no writ) ("case is moot when the actions sought to be enjoined have been fully performed")). The court similarly held that the final contract rendered moot the requests for declarations that the meeting notices violated the Open Meetings Act and the two prior employment contracts were void because the requested declarations could not affect a live controversy. *Id.* at 761. Finally, the court found the request for attorney's fees to be wholly dependent on the claim for injunctive relief, and therefore also moot. *Id.* at 762.

In *Meeker*, as in the cases discussed above involving expiration, the dispositive issue was that the plaintiff sought prospective relief against actions that were no longer in prospect. An injunction is inherently forward-looking, intended to prohibit present or future conduct. With de la Garza having stepped down as chancellor, an injunction purporting to prohibit his recognition in that office would have been pointless. His contracts having been superseded, any declaration would have been "ineffectual for want of a subject matter upon which it could operate." *Methodist Hosps.*, 874 S.W.2d at 147. Whereas, in the earlier cases, the allegedly valid rule had expired, in *Meeker*, the allegedly invalid contract had been superseded by a subsequent contract, but in neither scenario was the court confronted—as we are here—with the issue of whether an aggrieved plaintiff can recover damages (or obtain relief from obligations) incurred by reason of actions undertaken during the operation of the allegedly invalid rule or contract. True, the *Meeker* court noted that "[a]ctions in violation of [the Open Meetings Act] are voidable, not void, and remain valid until adjudicated and declared void," apparently finding significance in the fact that "the [first] Contract had not been adjudicated void before the [second] Contract superseded it, and the [second] Contract had not been adjudicated void before the [final] Contract replaced it." *Meeker*, 317 S.W.3d at 761. While that language may be read to support the Commission's position, we fail to see how it was essential to the outcome in *Meeker* itself. That is, we do not see how Meeker

22

would have had any greater or lesser entitlement to the prospective relief he sought if the employment contacts had been void ab initio. In that scenario, in our view, he still would have been improperly seeking to enjoin conduct completed in the past—the epitome of mootness.

The second Open Meetings Act case is more distinct factually and, therefore, less instructive. In July of 2006, the City of Dallas executed the Love Field Agreement, formally binding itself to the terms of an earlier provisional agreement allegedly negotiated in violation of the Open Meetings Act. *Love Terminal Partners v. City of Dallas*, 256 S.W.3d 893, 896 (Tex. App.—Dallas 2008, no pet.). The federal government later enacted the Wright Amendment Reform Act of 2006, incorporating many provisions of the Love Field Agreement. *Id*. The Plaintiffs (LTP) sued the city and others seeking declaratory and injunctive relief concerning Open Meetings Act violations in adopting the agreement. *Id*. at 895–96. In affirming the trial court's dismissal of the case as moot, the Dallas court held that the Reform Act's incorporation of the contract made Dallas' obligations a matter of federal law, rendering moot any challenge to the Love Field Agreement regarding such obligations. *Id*. at 897.

Like *Meeker*, the *LTP* case discusses the void/voidable distinction in terms superficially favorable to the Commission but ultimately of little relevance to the instant case. LTP had argued that, because the City's conduct leading up to the agreement violated the Open Meetings Act, the resulting contract was void and, therefore, the Reform Act did not moot their claims. *Id*. Admittedly, language in the opinion can be read as accepting LTP's premise, if ultimately rejecting its conclusion. Although the court recites the rule that "if conduct is merely voidable, the act is valid until adjudicated and declared void," *id.*, it is unclear how the case could have come out differently had the agreement been void ab initio rather than merely voidable because the agreement's *terms* had been incorporated into federal law at the time of the litigation.

23

What gave the agreement its continuing force, then, was not the (allegedly defective) process by which it was originally adopted but its incorporation into federal law. We do not understand our sister court to imply that, had it found the agreement void, it would have been free to enjoin Dallas' compliance with the federal Reform Act because, unbeknownst to the Congress that passed the bill and the President who signed it, they were incorporating a mere nullity into federal law. Rather, the *LTP* court probably meant nothing more than that the incorporation of the agreement into federal law rendered it too late for an adjudication of its voidability to have practical consequences for the parties, as they would be bound by the federal law in any event. This illustrates why the case is of limited use in resolving the present question. Whereas the operation of the Reform Act would have caused any intervention by the *LTP* court to be of no practical consequence, no comparable circumstance constrains our decision in the instant case. What *Meeker* and *LTP* have in common, then, is that, despite including language that, admittedly, can be read as supporting the Commission's interpretation, the facts of each case disclose a wholly independent reason for reaching the result: the prospective nature of the relief sought in *Meeker*, and the intervention of the federal government in *LTP*.

Of course, not every judgment or order overturning some putative official act necessarily operates to unwind every collateral consequence of the defunct act. The Commission cites *Brazzel v. Murray*, a 1972 case in which the Texas Supreme Court held that a judgment voidable for purely procedural reasons has practical effects until voided, unlike a void judgment that can have no effect from its inception. 481 S.W.2d 801, 803 (Tex. 1972). In that case, Brazzel obtained judgment against Murray at trial, but the Waco court reversed and remanded with costs assessed against Brazzel. *Id*. at 802. Under then-current procedural rules, the clerk of the appellate court was directed not to deliver the mandate of the court nor to certify the proceedings to the trial

court before the payment of costs, but the clerk did so in error. *Id*. Murray filed a motion to recall the mandate in the appellate court, which was granted, and later filed a motion to dismiss in the trial court, relying on a then-current rule providing that, if no mandate had issued within a year of final judgment, the trial court should dismiss the case from its docket. *Id*. Murray reasoned that, because the mandate had been issued in violation of the rule, the time during which the erroneously issued mandate had been in putative effect counted toward the one-year period prescribed by the rule. Finding that a year had passed after judgment without issuance of a mandate, the trial court dismissed the case, and the Corpus Christi court affirmed, holding that the erroneously issued mandate had been "void ab initio." *Id*.

The Supreme Court disagreed. The Court quoted liberally from the early case of *Murchison v. White* for the proposition that "[a] void act is one entirely null within itself, not binding on either party, and which is not susceptible of ratification or confirmation" such that "[its] nullity cannot be waived," whereas "[a] voidable act is one which is not absolutely void within itself, but which is binding until disaffirmed, and which may be made finally valid by failure within the proper time to have it annulled, or by subsequent ratification or confirmation." *Brazzel*, 481 S.W.2d at 803 (quoting *Murchison v. White*, 54 Tex. 78, 81 (1880) (internal quotation marks omitted)). Concluding that "judgments which are rendered without observance of statutory requirements which are purely procedural are not void, however irregular or erroneous they may be," the Court held that "[f]rom … the date of the original mandate, until … the date the original mandate was recalled, a mandate was on file with the trial court in this cause" and that, although "[it] was an unauthorized mandate, [it] was valid until recalled." As such, "[at] no time [had] there been a period of twelve months in which no mandate has been filed with the trial court, as required by [then-existing rules], as a basis for dismissal." *Brazzel*, 481 S.W.2d at 803.

25

But while *Brazzel* involves an official action that, once invalidated, was not entirely annulled, it does not stand for the proposition that Appellants here must live with the allegedly invalid electricity pricing at issue in this case without an opportunity for judicial review. In *Brazzel*, the primary defect in the mandate did not concern any relief to which Murray may have been entitled. True, Murray claimed a procedural right to challenge the validity of a mandate issued despite nonpayment of costs, but Murray did not claim the right to recover any costs incurred as a result of the mandate. The case therefore cannot be read to bar such recovery where such costs are at issue—nor to establish that the availability of such recovery would depend on whether the order was merely void rather than void ab initio. In any event, Appellants do not ask us to hold that the disputed Orders in this case were never issued. Rather, Appellants seek only a declaration as to the invalidity of the Orders, such that the pricing thereunder may not be applied in pending administrative proceedings. Such a declaration would not be inconsistent with *Brazzel*.

In summary, none of the cases cited to us by the Commission or aligned intervenors compels support for the Commission's position that courts lack jurisdiction to remedy actions undertaken pursuant to a voidable order before it is adjudicated as void. Our own review of the case law on this question inclines us to the opposite view.

The cases on voidability, including those cited by the Commission, trace back to early cases addressing the voidability of private contracts. *See, e.g.*, *Cummings v. Powell*, 8 Tex. 80 (1852) (surveying then-current authorities on voidability of contracts with minors). Perhaps the most familiar context in which the void/voidability distinction arises is the voidability of a contact with a minor. The hornbook law is that a contract made with a minor is voidable at the minor's election. *Dairyland Cnty. Mut. Ins. v. Roman*, 498 S.W.2d 154, 158 (Tex. 1973); *Prudential Bldg. & Loan Ass'n v. Shaw*, 26 S.W.2d 168, 171 (Tex. Comm'n App. 1930, judgm't adopted).

26

Importantly, a contract so voided is deemed to have been void for both parties from the beginning. *Kargar v. Sorrentino*, 788 S.W.2d 189, 191 (Tex. App.—Houston [14th Dist.] 1990, no writ). The effect, therefore, is essentially identical to the remedy of rescission, *i.e.*, to put the parties in their respective positions status quo ante, as though the contract had never formed. Accordingly, a minor who voids a contract on the ground of incapacity may recover the full amount of any consideration the minor has paid, but also must restore any consideration the minor has received. *Shaw*, 26 S.W.2d at 171; *James v. Barnett*, 404 S.W.2d 886, 888 (Tex. App.—Dallas 1966, writ ref'd n.r.e.); *see also Hogue v. Wilkinson*, 291 S.W.2d 750, 753 (Tex. App.—Texarkana 1956, no writ).

The latter two points are crucial. The minor, upon attaining the age of majority, has the option to ratify and enforce the contract, enjoying the benefit of the bargain. That is the very definition of a voidable contract. *See* CONTRACT, Black's Law Dictionary (11th ed. 2019) (defining "voidable contract" as "[a] contract that can be affirmed or rejected at the option of one of the parties"); *Murchison*, 54 Tex. at 81 ("[a] voidable act is one … which may be made finally valid . . . by subsequent ratification or confirmation"). And yet, in the contract context, we find nothing resembling the rule against retroactive relief urged by the Commission. On the contrary, not only may the voiding party recover consideration already paid under the contract, if any, the voiding party must tender any consideration previously received in order to be restored to status quo ante. By parity of reasoning, it is unclear why a party aggrieved by the voidable act of a state agency should not be able to recover a remedial sum necessary to make it whole once the act is finally adjudicated void, or, as here, to avoid an obligation predicated on the void act.

We are mindful that we have found no precedent that clearly and unambiguously disposes of the question before us. It is, moreover, entirely reasonable to suppose that some

27

allegedly invalid act by an agency may eventually become impracticable to remedy due to developments over the passage of time.  In the above-cited case of *Murchison v. White*, an early case involving a challenge to the judgment of a probate court, the Texas Supreme Court held that "[a] voidable act is one which is not absolutely void within itself, but which is binding until disaffirmed, and which may be made finally valid *by failure within the proper time to have it annulled*, or by subsequent ratification or confirmation."  54 Tex. at 81 (emphasis added).  The court did not specify the proper time in which to have an act annulled, but Appellants here filed their direct appeal within 15 days after the First Order was issued on February 15, 2021.  Section 39.001(f) of the Utilities Code, requires that validity challenges be brought "not later than the 15th day after the date on which the rule as adopted is published in the Texas Register."  It is undisputed that the Order challenged in this case was not filed in the Texas Register, so the event from which the statutory time limit is to run has not yet occurred.  We think it consonant with the spirit and intent of the statute, however, to hold Appellants' challenge, filed 15 days after the Order date, to be timely for purposes of the statutory provision.  As such, we further conclude that, under *Murchison*, Appellants have acted "within the proper time" to have the Orders annulled.

### *Appellants' Alleged Injury is Redressable.*

The Commission next argues that this Court lacks jurisdiction because Appellants' claims are not redressable.  We disagree.

The Commission cites cases reciting the general standard that we lack jurisdiction over cases in which the alleged injury is not likely to be remedied by the requested relief.  Referring to its own prior argument that Appellants can, at most, obtain a declaration concerning future application of the Orders but cannot disturb transactions already settled, the Commission reasons

28

that, because reversing the Orders "will not result in the return of any money that Appellants have already paid ERCOT pursuant to settlement invoices," such reversal will not remedy Appellants' injury, and our jurisdiction to order such reversal fails for want of redressability. The Commission begs the question. It imports its own previous conclusion from its mootness/voidness argument and uses it as a premise in its redressability argument. Having rejected that conclusion in the former context, however, we likewise reject its application as a premise here. We see no reason why the resolution of challenges to settlement invoices in ADR proceedings, whether due and payable or already paid under timely preserved protest, cannot and should not be governed by this Court's determination regarding appropriate pricing.

Citing a pair of statutory provisions, the Commission contends that "Appellants cannot show that any further proceedings on remand to reconsider or further justify the substance of the orders . . . will lead to application of a different rule or otherwise change the outcome of any pending administrative disputes." *See* Tex. Util. Code § 39.001(f); Tex. Gov't Code § 2001.040. Section 39.001(f) of the Utilities Code provides that a court "shall . . . if appropriate on reversal, remand [a rule held to be invalid] to the commission for further proceedings." Government Code Section 2001.040 requires that, on remanding certain rules to a state agency, a court "shall provide a reasonable time for the agency to either revise or readopt the rule through established procedure." The Commission argues in essence that, for purposes of redressability analysis, these provisions render the question whether Appellants' requested relief will remedy the alleged injury merely speculative, because the Commission may on remand simply ratify the previously adopted pricing Order. We disagree.

First, we do not share the Commission's view that the cited provisions limit our power to order an appropriate remedy. Taken in context, Section 39.001(f) of the Utilities Code

29

makes clear that we may affirm, reverse, or remand a rule. Reversal or remand of the rule could change the result of the pending administrative proceedings concerning amounts Appellants owe.

Second, Section 2001.040 of the Government Code uses permissive language—a court "*may* remand" a rule—but does not expressly prohibit a court from reversing outright. To the extent any prohibition is thought to be implied by that provision, we think it controlled by the more specific authority found in the Utilities Code that permits remand "if appropriate" upon reversal, suggesting that reversal without remand is the default. *See* Tex. Util. Code § 39.001(f); *see also id.* § 39.001(e) (providing that "Judicial review of competition rules adopted by the commission shall be conducted under Chapter 2001, Government Code, *except as otherwise provided by this chapter*" (emphasis added)).

Third, Section 2001.040 is limited by its own terms to remands based on a finding that an agency has not substantially complied with one or more procedural requirements of Sections 2001.0225 through 2001.034. Appellants' challenge is not limited to alleged lack of compliance with those provisions, however, but includes others, such as the failure to file with the Secretary of State under Section 2001.036. Thus, even the Commission's interpretation of Section 2001.040 would not deprive us of jurisdiction for want of redressability.

The Commission's final argument on redressability in turn consists of three essential components: (1) that ERCOT, rather than the Commission, is the appropriate entity to initiate a market-wide price correction, and ERCOT is not a party; (2) that Section 39.001(f), Utilities Code, does not authorize us to order the PUC to order ERCOT to undertake such repricing; and (3) that ERCOT's authority to act is too limited to redress Appellants' injury and, in any case, that it is too late under the Nodal Protocols for ERCOT to act. We disagree.

30

First, we are not persuaded that ERCOT must be brought before us as a party in order for us to grant the requested relief in light of the Commission's "complete authority" over ERCOT under Section 39.151(d), Utilities Code, together with ERCOT's power to determine market clearing prices unless "otherwise directed by the commission" under Title 16, Texas Administrative Code Section 25.501(a), both of which provisions were expressly referenced in the Order that is the subject of this suit.

Second, we do not find the limitation on our authority the Commission argues may be found in Section 39.001(f) of the Utilities Code. That provision directs a court of appeals considering a challenged rule "to render judgment affirming the rule or reversing and, if appropriate on reversal, remanding the rule to the commission for further proceedings, *consistent with the court's opinion and judgment*." Tex. Util. Code § 39.001(f) (emphasis added).

Third, the Commission overstates the effects of the Nodal Protocols. The Commission acknowledges that those rules "provide ERCOT with some discretion after settlement point prices have become final to determine that prices qualify for a correction and then seek ERCOT Board review of such prices." Per the Nodal Protocols, however, ERCOT would have had to notice participants during the month after the subject Order was issued and, the Commission argues, "[t]hat ship has sailed." Thus, "even if this Court were to order the PUC to issue an order directing ERCOT to resettle the market," the Commission reasons, "Appellants have not identified any means under the Nodal Protocols by which ERCOT can now make any market-wide corrections to pricing for EEA3-operating days." This argument lacks merit. The fact that ERCOT may be time-barred under the protocols from effecting a price correction on its own initiative has few if any implications for the question of whether it may do so pursuant to an order of this Court. While we can imagine scenarios in which limitations on an entity's powers to act may operate as

31

practical limitations on what a court may order it to do, this is not such a case. Where, as here, administrative disputes of the settlement statements were timely initiated and stayed pending decision of this timely-filed direct appeal, we discern no reason why the notice provisions that would ordinarily apply to ERCOT acting alone should prevent us from hearing Appellants' challenge and, if appropriate, granting relief.

### *The Orders are Rules.*

In its fourth challenge to this Court's jurisdiction, the Commission argues that the Orders were not competition rules within the meaning of Section 39.001(e), Utilities Code, and thus are not subject to the direct-appeal process provided by that statute. We agree that the statute is jurisdictional; as such, unless we find the subject Orders to be rules, we must dismiss. Appellants propose that the APA's definition of "rule" should govern here. The Commission contests the applicability of that definition, but also argues that, in any event, the Orders do not fall within its ambit. We will begin our analysis by assuming the statutory definition applies.

The APA defines "rule" as "a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy; or (ii) describes the procedure or practice requirements of a state agency," including "the amendment or repeal of a prior rule", but not including "a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." Tex. Gov't Code § 2001.003(6). The Commission argues, first, that the Orders cannot be rules because they are not generally applicable but are mere statements regarding internal management or organization and not affecting private rights or procedures. We have previously observed that the distinction between a rule and an internally directed agency statement may sometimes be "elusive" but have held the "core concept" to be that

32

"the agency statement must in itself have a binding effect on private parties." *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 546 (Tex. App.—Austin 2011, pet. denied) (citing *Texas Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 905 (Tex. App.—Austin 2009, no pet.)). The Commission reasons in essence that, because the Orders at issue here were directed to ERCOT rather than to market participants, the Orders could not in themselves bind private parties and thus cannot be rules within the meaning of the APA. We disagree.

The Commission's position here suffers from two significant defects. First, there is no dispute that the Orders at issue were intended to affect the rights of private parties and in fact did so. The Commission's hypothetical scenario, in which ERCOT fails to comply with the Order, may be an interesting thought experiment, but it does not refute the conclusion that the purpose and effect of the subject Orders was to cause market participants to pay (or receive) $9,000/MWh during the EEA3 event. For this reason, we are also unpersuaded by the Commission's proposed distinction between this case and the cases relied on by Appellants, involving "self-executing" rules rather than orders directed at (or through) ERCOT. The distinction arises from an artifact of the unique regulatory structure governing electric power in Texas, in which ERCOT acts as something akin to a subagency between the PUC and market participants. ERCOT is a separate entity, but one over which the PUC has "complete authority." Tex. Util. Code § 39.151(d). Where, as here, ERCOT acts as the Commission's agent, its acts are imputed to its principal. Put another way, we fail to see legal or factual support for the Commission's proposed distinction that would insulate it from review in countless cases in which it acts through ERCOT.

Second, the Commission's argument proves too much. For, if being directed solely to ERCOT rather than to market participants sufficed to negate a statement's status as a rule, any number of rules found in Title 16, Texas Administrative Code, Chapter 25 ("Substantive Rules

33

Applicable to Electric Service Providers") would likewise not be rules. Indeed, Section 25.505 of that chapter, the subject of the Orders at issue in this case, consists almost entirely of mandatory directives to ERCOT, and was adopted entirely through the formal APA rulemaking process. We think no one would seriously dispute that that section is a rule. Section 25.505 is general, in the sense that it affects the entire unregulated market in this state, or 26 million customers, and there can be little doubt that it "(i) implements, interprets, or prescribes law or policy" within the meaning of Section 2001.003(6)(A) of the Government Code. And, by definition, "the amendment … of a prior rule" is itself a rule. Tex. Gov't Code § 2001.003(6)(B). Thus, if the subject Order had the effect of amending a rule, then the Order by definition must also be a rule. Citing an outcome that was believed to be "contrary to the purpose of the rule," the Commission in its Order expressly granted an "exception" to Section 25.505's application, the basis for which is neither found in nor logically derived from the text of the rule itself. Accordingly, the effect of the Order on the cited rule fits the ordinary meaning of "amendment," and the Order, however packaged, therefore fits the statutory definition of a "rule."

None of the cases the Commission cites compel the contrary conclusion. At issue in *Slay*, for example, was whether an internal memorandum detailing the Texas Commission on Environmental Quality's (TCEQ) penalty policy constituted a rule for purposes of establishing jurisdiction under a statutory waiver of governmental immunity. *Slay*, 351 S.W.3d at 532. Critical to our finding that the trial court did not abuse its discretion in answering that question in the negative was the fact that, although TCEQ *staff* was required to follow the penalty policy's methodology in determining penalty recommendations, the *commissioners* were not bound to do so when acting on those recommendations but retained discretion to depart from the methodology when imposing penalties. *Id*. at 546. This is a significant distinction. In the present case, the

Commission issued the directive to ERCOT with the expectation that it be followed. Though ERCOT might have declined to follow the Commission's Order, but it had *no discretion* to do so and, in any event, it followed the Commission's directive in fact.

Similarly unavailing is *Vista Community Medical Center*, another case distinguishing internally directed statements from those of general applicability. *Texas Mut. Ins. v. Vista Cmty. Med. Ctr., LLP*, 275 S.W.3d 538 (Tex. App.—Austin 2008, pet. denied). In *Vista*, we reversed the trial court's determination that a one-page staff report, delivered by the director of medical review to the agency commissioners of the Texas Department of Insurance Division of Workers Compensation at an open meeting and arguing for one of two conflicting interpretations of an existing agency rule, was itself a rule that had to be adopted in conformance with APA rulemaking proposals. *Id*. at 545–46. We found that the staff report was not a "statement by a state agency" within the meaning of the APA's definition of a rule. *Id*. at 555. We noted that the report "was a one-page document prepared by the director of the Medical Review Division … that was intended to address an internal agency matter—namely, the inconsistent application" of a particular rule. *Id*. The present case could scarcely be more different. Here, the subject Orders were voted on and issued by the Commission. There is therefore no dispute that they constitute a statement by a state agency.

We went further in *Vista*, noting that, even if the report had been an agency statement, it lacked other characteristics of a rule. We noted that "not every administrative pronouncement is a rule within the meaning of the APA." *Id*. (citing *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994); *Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 769 (Tex. App.—Austin 1999, no pet.)). Acknowledging that "agencies routinely issue letters, guidelines, and reports, and occasionally file briefs in court proceedings, any of which might

contain statements that intrinsically implement, interpret, or prescribe law, policy, or procedure or practice requirements," we reasoned that subjecting every such statement to rulemaking requirements would make it impossible for an agency to carry out its legislative functions. *Id.* (quoting *Brinkley*, 986 S.W.2d at 769). In determining whether an agency's interpretation of its own rule was also a rule, following the Supreme Court's holding in *El Paso I*, we concluded that an interpretation that contradicted or otherwise amended an existing rule would be a new rule, but found no such amendment in the case then before us. *Id*. at 555-56 (citing *El Paso I*, 247 S.W.3d at 714–15). The report "was presented to the Division at the January 2005 open meeting, but the Division simply thanked the director for the report and took no official action." *Id*. Again, the present case could not be more different. Far from an internal discussion of opinion, the subject Order was just that—an *order*, intended to secure compliance by ERCOT and bring about a desired outcome. And, as already noted above, the Order at issue in this case had the effect of creating an extratextual exception to a previous rule, and therefore did not merely interpret but also amended that rule.

### *Appellants Challenge the Validity of the Orders.*

The Commission further argues that we lack jurisdiction because Appellants challenge the application, rather than the validity of the subject Orders. We disagree. It is true that the PUC gave incomplete guidance to ERCOT, with the understanding that the latter entity would take appropriate measures to achieve the desired result. But from the face of the pleadings, it is apparent that most if not all Appellants clearly challenge not only the measures but the guidance itself.

In the subject Order, the Commission stated the problem it confronted as follows:

> ERCOT has informed the Commission that energy prices across the system are clearing at less than $9,000, which is the current system-wide offer cap pursuant to 16 TAC § 25.505(g)(6)(B). The Commission believes this outcome is inconsistent with the fundamental design of the ERCOT market. Energy prices should reflect scarcity of the supply. If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest.

Having thus summarized the problem it sought to address, the Commission continued, "[a]ccordingly, the Commission directs ERCOT to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals." *Id*.

We read the foregoing Order to require—quite expressly—that ERCOT take steps necessary to ensure that energy prices would clear at $9,000 during the duration of the EEA3 event. We understand Appellants to complain that ERCOT in fact did so. We do not hear Appellants to challenge only the manner in which ERCOT achieved that result; nor has any party urged an interpretation of the Order in support of an argument that, for example, a rogue ERCOT made the complained-of pricing changes without authorization from the PUC. Moreover, Appellants explicitly invoke the language of a substantive and procedural validity challenge. In sum, we see nothing in the record or the briefing before us to indicate that this case involves a challenge to application rather than validity.

For the reasons set forth above, we overrule the Commission's challenges to our jurisdiction and proceed to consider the merits of the Appeal.

**Merits**

Appellants bring two challenges to the validity of the subject Orders in this case. First, Appellants argue that the Orders constitute competition rules and that the Commission in

adopting those rules failed to comply with APA's regular or emergency rulemaking procedures. Second, as an independent ground for relief, Appellants contend that the substance of the Orders themselves exceeded the Commission's statutory authority. Because we agree with Appellants as to the second ground, we do not address the first.

Luminant's substantive challenge to the Commission's statutory authority in turn rests on two sub-arguments: first, that the subject Orders "contravene[ ] statutory language and run[ ] counter to statutory objectives that electricity prices should be determined by the normal forces of competition," and, second, that the Orders were not properly limited in duration. Because we agree with the first of these arguments, we do not reach the second.

State administrative agencies have only those powers that the legislature expressly confers upon them and those implied powers that are reasonably necessary to carry out their express functions or duties. *See Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 315 (Tex. 2001). Absent specific or implied statutory authority, an agency rule is invalid. *Id*. Furthermore, an agency may not exercise what is effectively a new power based on a claim that the exercise is expedient for administrative purposes. *Id*. To establish a rule's facial invalidity, a challenger must show that the rule (1) contravenes specific statutory language; (2) is counter to the statute's general objectives; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *Texas Ass'n of Acupuncture & Oriental Med. v. Texas Bd. of Chiropractic Exam'rs*, 524 S.W.3d 734, 739 (Tex. App.—Austin 2017, no pet).

Determining the validity of a rule requires us to construe the statutory language from which the agency's authority purportedly flows. *Texas Orthopaedic Ass'n v. Texas State Bd. of Podiatric Med. Exam'rs*, 254 S.W.3d 714, 719–20 (Tex. App.—Austin 2008, pet. denied). In

construing a statute, our primary objective is to give effect to the legislature's intent. *Liberty Mut. Ins. v. Adcock*, 412 S.W.3d 492, 494 (Tex. 2013). "The 'surest guide to what lawmakers intended' is the enacted language of a statute." *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018) (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 463 (Tex. 2009)). We defer to the agency's construction of a statute "only when the statutory language is ambiguous." *Southwest Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016). If the statute is unambiguous, agency deference "has no place." *TracFone Wireless, Inc. v. Commission on State Emergency Commc'ns*, 397 S.W.3d 173, 182 (Tex. 2013).

Two Utilities Code provisions are key here. The first provision is the policy-and-purpose provision set forth at the beginning Chapter 39, which includes the Legislature's express finding that "the production and sale of electricity is not a monopoly warranting regulation of rates, operations, and services and that the public interest in competitive electric markets requires that … electric services and their prices should be determined by customer choices and the normal forces of competition." *Id*. § 39.001(a). That section further provides that "[r]egulatory authorities … shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter to the greatest extent feasible and shall adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition." *Id*. § 39.001(d).

The second provision is Section 39.151(d), Utilities Code, which the Commission expressly invoked in the Orders. Importantly, the Orders expressly addressed the scarcity pricing mechanism that by its own terms was adopted pursuant to Section 39.151(d). *See* Tex. Admin. Code § 25.505(g)(6)(B) (eff. May 30, 2019, to July 13, 2021). Section 39.151 chiefly concerns the creation and management of ISOs but also provides, in relevant part, that "[t]he commission

39

shall adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants, or may delegate to an independent organization responsibilities for establishing or enforcing such rules." Tex. Util. Code § 39.151(d). "Independent organization" is defined as a region's ISO, which, in this case, is ERCOT. *Id*. § 39.151(b); *Texas Com. Energy*, 2004 WL 1777597, at \*2. An adjacent provision requires such entities to "ensure the reliability and adequacy of the regional electrical network." *Id*. § 39.151(a)(2).

A threshold question is whether the authority granted by Section 39.151 qualifies, or is qualified by, the limitations imposed by 39.001. Put another way, the question is whether, or to what extent, Section 39.151's directive to ensure system reliability provides an exception to Section 39.001's general preference for reliance on competition rather than regulation to set prices. This appears to be a case of first impression. We must interpret statutory text in light of the statute as a whole. *Davis v. Morath*, 624 S.W.3d 215, 222 (Tex. 2021). We must, if possible, give effect to all included words without treating any language as surplusage. *Hlavinka v. HSC Pipeline P'ship, LLC*, 650 S.W.3d 483, 491 (Tex. 2022), reh'g denied (Sept. 2, 2022); *see also* Tex. Gov't Code § 311.021 (providing that "[i]n enacting a statute, it is presumed that … the entire statute is intended to be effective"). Here, Section 39.001 makes clear that "competitive rather than regulatory methods" are preferred "to the greatest extent feasible," and with "the least impact on competition." *Id*. § 39.001(d). In contrast, Section 39.151 is silent as to whether "regulatory" rather than "competitive" methods may be adopted to ensure grid reliability. In the absence of specific guidance from Section 39.151, the Commission's actions must be subject to the constraint provided by the text of Section 39.001. Fidelity to the whole-text canon, as codified in our Code Construction Act, requires that we give effect to the phrase "greatest extent feasible." To find that

40

the subject Orders were compliant with this statutory constraint, then, we must find that the Orders could not have used "competitive rather than regulatory methods" to any greater extent than they did as issued. This we cannot do; the very notion is belied by the operation of the SPM as it existed immediately before the issuance of the subject Orders, and by the fact that, operating independently, this SMP did not result in "HCAP" pricing.

In extreme circumstances under extraordinary pressure, the Commission exceeded its power by eliminating competition entirely. The previously adopted rule set the system-wide offer cap at $9,000/MWh. 16 Tex. Admin. Code § 25.505(g)(6)(B). The typical market clearing price in Texas can be $30/MWh. During Winter Storm Uri, the price had risen to just above $1,200, but that rise was not having the effect the Commission desired. The Orders, which we determined above are rules, instructed that if customer load is being shed, scarcity is at its maximum, and "the market price for the energy needed to serve that load should also be at its highest." First Order, at 1; Second Order, at 1. Knowing that the First Order caused ERCOT to set the market clearing price at the market cap of $9,000/MWh, the Commission issued the Second Order with the identical language directing that the market price for energy be at its highest while there was load shed. For four days under the Orders, the minimum price was the same as the maximum price by operation of executive fiat. While the breadth of the Commission's discretion largely resists sharp delineation, the Legislature clearly stated that the Commission's rules must be "limited so as to impose *the least* impact on competition." *See* Tex. Util. Code § 39.001(d) (emphasis added). Instead, the Orders had the maximum impact on competition conceivable by setting a single price for power and directing ERCOT to take all necessary steps to ensure the market cleared at that single price. While the extraordinary circumstances of Winter Storm Uri may have required extraordinary modifications to the SPM to send appropriate pricing signals to

41

prompt the necessary market response, the Commission here exceeded the Legislature's limits on its power. Setting a single price at the rule-based maximum price violated the Legislature's requirement in the Utilities Code Section 39.001(d) that the Commission use competitive methods to the greatest extent feasible and impose the least impact on competition.

## IV.
## CONCLUSION

For the foregoing reasons, we reverse the Commission's Orders of February 15 and 16, 2021, and remand this case for further proceedings consistent with our ruling.

_____
Edward Smith, Justice

Before Chief Justice Byrne, Justices Goodwin and Smith;
  Justice Goodwin not participating

Reversed and Remanded

Filed: March 17, 2023